EUGENE G. IREDALE: SBN 75292
PETER BIBRING: SBN 223981
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221
Attorneys for Plaintiffs

JOSEPH C. CRUDO: SBN 263993
JOSEPH C. CRUDO PLC
3990 Old Town Avenue, Ste. C101
San Diego, CA 92110
Telephone: (858) 622-7280
Fax: (858) 450-9411
Email: joseph@crudoplc.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMEL BURT,<br><br>        Plaintiff,<br><br>v.<br><br>NICOLAI RAMOS, in his individual capacity, and the COUNTY OF SAN DIEGO,<br><br>        Defendants. | CASE NO. 24-CV-0662-CAB-VET<br><br>**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS COUNTY OF SAN DIEGO'S AND NICOLAI RAMOS'S MOTIONS FOR SUMMARY JUDGMENT**<br><br>Hon. Cathy Ann Bencivengo<br><br>Date: July 27, 2025<br>Courtroom: 15A<br><br>**[PER CHAMBER RULES, NO ORAL ARGUMENT UNLESS ORDERED BY COURT]** |

# **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

FACTUAL SUMMARY ................................................................................................2

LEGAL STANDARD.....................................................................................................9

ARGUMENT ...............................................................................................................10

I.      Deputy Ramos Is Not Entitled to Summary Judgment. ..................................10

   A. Ramos is Not Entitled to Summary Judgment on Plaintiff's Excessive Force Claim. ................................................................................................10

      1.   A Jury Could Find that Ramos Smashing Mr. Burt Face-First into the Sidewalk for No Reason is Unreasonable Force. ......................................10

      2.   Ramos's Argument in Support of His Motion for Summary Judgment Rests on Disputed or Irrelevant Facts.......................................................14

   B. Ramos Is Not Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim. ................................................................................................16

   C. Ramos is Not Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim.............................................................................................19

   D. Ramos is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claim.........................................................................................................20

   E. Ramos is Not Entitled To Summary Judgment on Plaintiff's Bane Act Claim.........................................................................................................23

II.     The County is Liable for Ramos's Excessive Force under *Monell* ...............24

   A. The County Has a Custom and Practice of Tolerating Excessive Force, Particularly Against Restrained Individuals...............................................25

      1.   The Sheriff's Department almost never finds force out of policy.............26

      2.   The Sheriff's Department has paid out tens of millions of dollars in dozens of excessive force cases................................................................30

      3.   The Sheriff's Department has been subject to a pattern of lawsuits alleging excessive physical force, both generally and against restrained individuals specifically. ............................................................................31

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

B. The County failed to discipline Ramos for nearly identical use of excessive force on Joshua Strode ...............................................................................35

   1. Deputy Ramos's aggressive 2017 takedown of Joshua Strode .................35

   2. A jury could reasonably conclude that Department failed to discipline Ramos for his use of excessive force on Strode, and that the Sheriff approved that failure ...............................................................................38

C. The County fails to adequately guard against use of force against restrained individuals.......................................................................................40

   1. The County Fails to Provide Policies and Training Limiting Force Against Handcuffed and Restrained Subjects ...........................................41

   2. The County was on notice of the deficiencies in its policy by December 2022...............................................................................................42

D. *Monell* does not require that the County's policies are facially unlawful.....43

III. Plaintiff's Bane Act claim rests on *respondeat superior* liability for Ramos's conduct..................................................................................44

CONCLUSION ...................................................................................45

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................9

*Astorga v. Cnty. of San Diego*,
    No. 321CV00463BENKSC, 2022 WL 1556164 (S.D. Cal. May 17, 2022) ........44

*Ballentine v. Tucker*, 28 F.4th 54 (9th Cir. 2022)............................................. 16, 23

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997)....................40

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007)........................ 19, 39

*Bryan v. Macpherson*, 630 F.3d 805 (9th Cir. 2010)........................... 11, 12, 13, 17

*Bryant v. Whalen*, 759 F. Supp. 410 (N.D. Ill. 1991)...............................................28

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) .....................................................43

*City of Canton v. Harris*, 489 U.S. 378 (1989)........................................................40

*Connick v. Thompson*, 563 U.S. 51 (2011)...............................................................34

*Cty. of St. Lewis v. Praprotnik,* 485 U.S. 112 (1988) ..............................................39

*Davis v. City of Las Vegas,* 478 F.3d 1048 (9th Cir. 2007).....................................17

*Duran v. City of. Douglas*, 904 F.2d 1372 (9th Cir. 1990).....................................21

*Edson v. City of Anaheim,* 63 Cal. App. 4th 1269 (1998) .......................................19

*Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013)...............................16

*Est. of Nunez by & through Nunis v. City of Chula Vista*,
    676 F. Supp. 3d 867 (S.D. Cal. 2023)................................................................24

*Est. of Shafer ex rel. Shafer v. City of Elgin, Or.*,
    No. 2:12-CV-00407-SU, 2014 WL 6633106 (D. Or. Nov. 21, 2014).................39

*Finley v. City of Oakland,*
    No. C 04-5102 MEJ, 2006 WL 269950 (N.D. Cal. Feb. 2, 2006).......................19

*Fuller v. City of Oakland,* 47 F.3d 1522 (9th Cir. 1995)........................................39

*Gant v. Cnty. of Los Angeles*, 772 F.3d 608 (9th Cir. 2014) ..................................44

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992) ...............................................39

*Glenn v. City of Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011) .................. 11, 13

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

*Gordon v. Cnty. of Orange*, 6 F.4th 961 (9th Cir. 2021) ........................................24

*Graham v. Connor*, 490 U.S. 386 (1989) ....................................................... 11, 14

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013) ..................................17

*Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177 (2004) ..........................20

*Hocking v. City of Roseville*,
   No. CIVS060316RRBEFB, 2008 WL 1808250 (E.D. Cal. Apr. 22, 2008) .........28

*Hunter v. Cnty. of Sacramento*, 652 F.3d 1225 (9th Cir. 2011) ....................... 25, 35

*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014) ....................................................25

*K.J.P. v. Cnty. of San Diego*, 621 F. Supp. 3d 1097 (S.D. Cal. 2022) ............. 33, 43

*Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741 (9th Cir. 2001) .........22

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...................................39

*Lefkowitz v. Turley*, 414 U.S. 70 (1973) ................................................................20

*Liston v. County of Riverside,* 120 F.3d 965 (9th Cir. 1997).....................................9

*Lytle v. Carl*, 382 F.3d 978 (9th Cir. 2004) ............................................................39

*Mackinney v. Nielson*, 69 F.3d 1002 (9th Cir. 1995)...............................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). ...............9

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) ..................................................12

*Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283 (9th Cir. 1999)..... 20, 23

*Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018 (N.D. Cal. 2022) ...........25

*Naveed v. City of San Jose*,
   No. 15-cv-05298-PSG, 2016 WL 2957147 (N.D. Cal. May 23, 2016)................22

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ...........................................17

*Nelson v. City of Davis*, 709 F. Supp. 2d 978 (E.D. Cal. 2010) .............................19

*Noble-Perez v. Robinson*,
   No. 822CV00037JVSJDEX, 2023 WL 6194265 (C.D. Cal. Aug. 16, 2023).......20

*Pashuta v. City of San Diego*,
   No. 319CV2386CABBLM, 2020 WL 1550217 (S.D. Cal. Apr. 1, 2020) ...........24

*Reese v. Cnty of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) ......................... 23, 24

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

*Rice v. Morehouse*, 989 F.3d 1112 (9th Cir. 2021) ........................ 11, 13, 15, 17, 19

*S.R. Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019)..............................................25

*Sampson v. Cnty. of Los Angeles by & through Los Angeles Cnty.*
  *Dep't of Child. & Fam. Servs.*, 974 F.3d 1012 (9th Cir. 2020)..............................16

*Sanderlin v. Dwyer*, 116 F.4th 905 (9th Cir. 2024) ..................................................22

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005). ................................. 9, 12, 17

*Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985) .........................................28

*Thomas v. Cnty. of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ..................................24

*Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011) .........................................10

*Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968 (9th Cir. 2002) ....................21

*Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230 (2007).........................24

*Watkins v. City of Oakland, Cal.*, 145 F.3d 1087 (9th Cir. 1998) ............................39

*Young v. Cnty. of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) ......................... 12, 17

**Statutes**

Cal. Govt. Code § 815.2....................................................................................................44

Cal. Civil Code § 52.1.......................................................................................................44

**Rules**

Fed. R. Civ. P. 56(a)............................................................................................................9

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# INTRODUCTION

In seeking summary judgment, Defendants ask this Court to assume that jurors simply will not believe their eyes. The body-worn camera video shows Deputy Nicolai Ramos angrily pulling a handcuffed Jamel Burt to his feet when Mr. Burt curses at him and refuses to answer questions, pushing Mr. Burt into a patrol car, then swinging him across his leg and smashing him face-first into the ground, breaking his teeth. The video provides all the evidence a reasonable jury would need to find Deputy Ramos used excessive force and did so for no reason other than to retaliate against Mr. Burt for constitutionally protected activity of cursing at Ramos for yelling — evidence that is only further supported by Burt's testimony that he was complying and the opinions of Plaintiff's expert that Ramos lacked any justification for such force. And any reasonable officer would know that such unjustified force to punish speech violated the law. In the face of this evidence, Deputy Ramos's motion for summary judgment verges on frivolous.

Plaintiff also provides ample evidence for a jury to hold the County liable for Deputy Ramos's use of force under *Monell*, on any of three theories. First, a jury could easily conclude that the Sheriff's Department maintains a practice of tolerating excessive force. Despite its policies of supposedly subjecting every use of force to multiple layers of review, Plaintiffs' evidence shows that in the three years leading up to Ramos's use of force, the Department found on average **only one use of force each year out of policy** — about one in every 3,500 uses of force — making it virtually impossible for a Sheriff's Department deputy to be disciplined for excessive force. Plaintiffs' expert notes that these rates are so far below what would be expected of a law enforcement agency with as many officers and use of force incidents as the Sheriff's Department that the only reasonable conclusion is that the agency simply turns a blind eye to excessive force.

This practice of tolerating excessive force directly caused this incident. When Deputy Ramos used the same maneuver in 2017 to slam a partially

1

handcuffed detainee with a broken clavicle into a wall in the jail for no valid reason, the Department investigated and found his use of force appropriate, just like it does nearly every other use of force. It issued a written reprimand only for a failure to. A jury could easily find that had the Department properly disciplined that unconstitutional force, Ramos likely would not have repeated the technique with Mr. Burt.

The County is liable for a second, independent reason.  The Sheriff's Department gave Ramos a written reprimand in the 2017 incident, not for excessive force, but for failing to communicatee effectively. The County's Rule 30(b)(6) witness stated that the Sheriff reviewed and approved the results of any such formal discipline. Because the Sheriff is a policymaker for the County, his ratification of the failure to discipline Ramos for the 2017 use of force makes the County liable even without a pattern of other misconduct.

Third, unlike most other agencies, the Sheriff's Department's policy and training fails to provide guidance to its officers not to use force on restrained subjects — failures that Plaintiff's expert notes are "serious deficiencies" in its policies and would have prevented the unconstitutional use of force here.

Finally, notwithstanding the County's baseless arguments to the contrary, it is liable on Plaintiff's Bane Act claim in respondeat superior if the jury finds Defendant Ramos liable, which it unquestionably could do. On this record, the Court should plainly deny Defendants' motions for summary judgment.

## FACTUAL SUMMARY

Shortly after 2:00 p.m. on December 18, 2022, Deputy Nicolai Ramos pulled over a truck driven by Perry Lotts Mr. Burt was riding in the passenger seat. (Exh. A, Burt Depo., 35:10-14; 36:21-22, 37:12-20; Exh. 1 to Ramos's MSJ ("Def's Exh. 1"), Arrest Report, at 1, 3 and 6.) Ramos ordered Mr. Lotts out of the truck, handcuffed him, and told him that he had stopped him for "multiple vehicle code violations," including a non-working brake light, and that Ramos had seen

2

something tossed out of the passenger window he believed was contraband. (Exh. 4 to Ramos's MSJ ("Def's Exh. 4"), Ramos BWC at 1:05; Exh. B, 127:2-4.)[1] Ramos searched Mr. Lotts and checked his ID. (Def's Exh. 4 at 1:52.)

While Ramos spoke with Mr. Lotts, Deputy Jacob Wilder arrived and approached Mr. Burt as he sat in the truck's passenger seat. (Exh. 5 to Ramos's MSJ ("Def's Exh. 5"), Wilder BWC at 0:01.) Wilder's body-worn camera clearly captures the tone and character of his interaction with Mr. Burt.

Mr. Burt sat calmly with his right arm resting on the open window. (*Id*.) Wilder asked Mr. Burt if he had any weapons on him and Mr. Burt responded, "No." (*Id*. at 0:13; Exh. A, 109:1-9.) Wilder asked Mr. Burt to step out of the truck, and Mr. Burt complied. Wilder turned him to face the open truck door and asked him to put his hands behind his back, and Mr. Burt did so and allowed Wilder to handcuff him. (Def's Exh 5 at 0:20-0:46; Exh. A, 109:18-23.) Mr. Burt stood still the entire time. He did not resist Wilder's efforts to handcuff him or try to pull away. He offered to remove his gloves to make it easier for Wilder to secure the handcuffs. (Def's Exh. 5 at 0:48.) Wilder told Mr. Burt: "I can be a little nice, you're being cooperative with me." (*Id*. at 0:57.)

After Wilder secured the handcuffs, he again asked Mr. Burt whether he had any weapons again, and Mr. Burt again said he did not. (Def's Exh. 5 at 1:01.) Wilder told Mr. Burt that he was going to pat him down and Mr. Burt responded, "yep," and stood still as Wilder patted him down. (*Id*. at 1:04-1:06; Def's Exh. 5 at 1:07-1:15; Exh. A, 111:10-16.) Wilder asked if Mr. Burt had ID, and Mr. Burt responded, "No. . . I lost it." (Def's Exh. 5 at 1:14-1:19.) Wilder then lowered Mr. Burt to sit on the curb next to the truck. (*Id*. at 1:21.)

As Mr. Burt sat on the curb, Wilder asked him how his day was going. (*Id*. at 1:30.) Mr. Burt responded cordially, "Uh, it was alright… nothing to brag about."

---

[1] All references to time stamps in the BWC videos refer to the run time of the video, not the time stamp displayed on the upper right-hand corner of the screen.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(*Id.* at 1:31-1:37; Exh. A, 112:9-14.) Mr. Burt believed Wilder was being polite with him and wanted to reciprocate. (Exh. A, 112:15-21.) Wilder continued to chat with Mr. Burt. He asked him whether he was from Maryland. (Def's Exh. 5 at 1:50.) Mr. Burt responded, "No." (*Id.* at 1:52.) Mr. Burt then sat in silence as Wilder used his phone. (*Id.* at 1:53-2:24.) Moments later, Wilder asked Mr. Burt if he had ever been arrested in San Diego County. (*Id.* at 2:25; Exh. A, 113:15-17.) Mr. Burt told him that he had. (Def's Exh. 5 at 2:27; Exh. A, 113:18-19.) Wilder asked, "What's your last name bud?" and Mr. Burt spelled it out for him: "B-U-R-T." (Def's Exh. 5 at 2:28-2:29; Exh. A, 113:22-25.) Wilder then asked, "What's your first name, man?" and Mr. Burt spelled it out: "J-A-M-E-L." (Def's Exh. 5 at 2:38-2:40; Exh A, 113:24-114:4.) Mr. Burt sat quietly as Wilder entered the information into his phone. (Def's Exh. 5 at 2:41-3:09; Exh. A, 114:8-11.)

Ramos then left Mr. Lotts, approached Wilder and Mr. Burt and asked Mr. Burt if he had any ID on him. (Def's Exh. 5 at 3:56; Exh. 4 at 5:06.) Wilder told Ramos that Mr. Burt had some cards in his back pocket, but it was not his ID. (Def's Exh. 4 at 5:09-5:14.) Ramos asked Mr. Burt again whether he had ID and Mr. Burt responded, "No." (*Id.* at 5:15-5:15.) Ramos then turned around and yelled at Mr. Lotts to be quiet, threatening to put him in a parked patrol car. (*Id.* at 5:17-5:20.)

Ramos turned back to Mr. Burt and asked whether he had ID for a third time. (*Id.* at 5:27.) Mr. Burt responded, "No sir." (*Id.* at 5:28.) Ramos snapped, "You're supposed to have ID on you!" (*Id.*) Mr. Burt replied, "I lost it." (*Id.* at 5:30.) Ramos asked Mr. Burt where he lived. (*Id.* at 5:34-5:37.) Mr. Burt told Ramos that he lived on Paraiso. (*Id.* at 5:38.) Ramos asked Mr. Burt his name. Mr. Burt gestured to Wilder and said, "This man already knows." (*Id.* at 5:41-5:45.) Wilder showed Ramos his phone with Mr. Burt's name on it. (*Id.* at 5:48.) Mr. Burt remained handcuffed and sat on the curb next to truck. (*Id.*)

Wilder asked Mr. Burt to confirm his name and spell it again, which Mr. Burt did. (Def's Exh. 4. at 5:54-6:04; Exh. A, 115:13-22.) Mr. Burt also gave Wilder his

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

date of birth. (Def's Exh. 4 at 6:10-6:13; Exh. A, 116:3-4.) Ramos was standing right next to Mr. Burt and heard him provide his name and date of birth. (*Id*.) By this time, Mr. Burt had provided his full name twice, and his date of birth and his address. When Wilder asked for Mr. Burt for his address again, Mr. Burt responded, "that's the last question I'm answering." (Def's Exh. 4 at 6:18-6:24.)

Ramos immediately yelled at Mr. Burt that he was being uncooperative and threatened to put him in the back of his car. (Def's Exh. 4 at 6:24-6:26.) Mr. Burt denied being uncooperative. He told Ramos and Wilder that he had already given them his name. (Def's Exh. 4 at 6:26-6:30.) Ramos refused to listen to Mr. Burt and aggressively pressed him about his ID. (*Id*. at 6:35-6:38.) Mr. Burt told Ramos, "Hey man, stop yelling in my motherfucking ear man." (*Id*. at 6:39-6:41.) In his arrest report, Ramos wrote that Burt had yelled this at him (Def's Exh. 1, p. 8.) but the video plainly shows that he did not. He said in a tone of annoyance only slightly elevated from his previous, relaxed responses. (Def's Exh. 4 at 6:39-6:41.) Ramos instantly snapped, "Alright, you're gonna go in my car." (*Id*. at 6:41.) He grabbed Mr. Burt under the arm, yanked him up from the curb and, holding a tight grip on his left arm, pushed him towards the patrol vehicles. (*Id*. at 6:42; Def's Exh. 5 at 5:30.) As Wilder's BWC shows, Mr. Burt's pants were obviously falling down as Ramos pushed him:



PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(Def's Exh. 5 at 5:34.) As Ramos pushed Mr. Burt towards the patrol cars, Mr. Burt tried to keep up, but his falling pants meant he could not take full strides. (Exh. A, 117:21-118:2.) Although he remained handcuffed, he tried to hold his pants up with two fingers while keeping pace with Ramos. (*Id.* 118:3-7, 119:5-9.) Ramos responded by ordering Mr. Burt to "stop flexing." (Def's Exh. 4 at 6:42-6:50.) Mr. Burt testified repeatedly that he did not understand what Ramos meant by "stop flexing" because he was walking to the car and trying to comply with orders. (Exh. A, 48:10-15; 69:11-18, 70:14-19.) Mr. Burt testified emphatically that he was not pulling his body one way or the other. (*Id.* 48:20-49:4.)

Though Mr. Burt responded with profanities ("shit", "fuck you", "shut up, shut up, shut up", "bitch ass mother fucker"), he did not resist or threaten Ramos. (Exh. A, 119:10-12; Def's Exh. 4 at 6:42-6:50; Def's Exh. 5 at 5:35-5:40.) He was still handcuffed. (Exh. B, 155:17-19.)

Just seconds later, Ramos slammed Mr. Burt into the side of patrol vehicle:



(Def's Exh. 5 at 5:41.)

Throughout his motion, Ramos claims that once he had pinned Mr. Burt against the car, Mr. Burt quickly turned right, causing Ramos to lose his grip on Mr. Burt's left arm. (*See e.g.*, Ramos Mot. at 4:1-8.) But Mr. Burt unequivocally denied

6

that he moved and that Ramos lost his grip. (Exh. A, 48:20-49:4; 50:9-23.)

After slamming Mr. Burt into the side of the car, Ramos anchored his right foot on the ground and placed his left foot on the curb. He then yanked Mr. Burt back over his right leg causing him to fall, face-first into the concrete sidewalk:

 

(Def's Exh. 5 at 5:43-5:44; *see also* Exh. C, slow motion excerpt of Wilder BWC.)

Only twelve seconds elapsed from the time Ramos first grabbed Mr. Burt to the time he smashed his face against the sidewalk. The impact shattered two of Mr. Burt's front teeth. (Def's Exh. 5 at 5:31-5:43; Exh. A, 51:2-14; Exh. D, COSD000482, photo of Mr. Burt's broken front teeth.) The pain was an immediate ten out of ten. (Exh. A, 52:13-17.) Mr. Burt was handcuffed at the time and could not break his fall. (Def's Exh. 5 at 5:31-5:43.) Ramos knew that Mr. Burt was handcuffed the entire time he was dealing with him. (Exh. B, 156:14-25.)

Ramos piled on top of Mr. Burt, pushed his hand into the back of Mr. Burt's head and ground his face into the dirt (Def's Exh. 5 at 5:45; Def's Exh. 4 at 6:57; see also Exh. A at 74:18-24):

7

 

Mr. Burt still suffers pain from where Ramos smashed his teeth and speaks with a lisp. (Exh. A, 77:4-11; 93:3-12; 97:2-9.) Mr. Burt also suffered injuries to his shoulder, ribs and foot which hurt for a couple of weeks to a month. (*Id*. 78:10-13; 22-24 and 80:12-18.)

After smashing his face into the concrete, Ramos arrested Mr. Burt for a violating Penal Code § 148(A)(1) Obstructing or Resisting a Police Officer. (Exh. 1, 40:12-16; Def's Exh. 1, p. 3; Exh. B, 98:11-14.) Prosecutors later dropped the charges against Mr. Burt. (Exh. A, 40:17-18.)

In his supplemental use of force report, Ramos claimed that slamming Mr. Burt face first into the concrete was "necessary to defend self or another" and "necessary to prevent escape/evasion." (Exh. E at 1.) Roger Clark, Plaintiff's police practices expert, reviewed the body-worn camera footage and opined that there was no valid law enforcement purpose for Ramos's conduct in pushing Mr. Burt and in Ramos's use of force. (See Declaration of Roger Clark ("Clark Dec."), filed concurrently herewith at ¶ 5.) There was no legitimate basis for Ramos to use any level of force. (*Id*.) There was no justification for Ramos's use of force because Mr. Burt was handcuffed, never assaulted any Deputy, and was under the control of

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Ramos at all times during the escort. (*Id*. at ¶ 6.) Mr. Clark found that the force inflicted by Ramos throwing Mr. Burt to the ground violated policy and training. (*Id*. at ¶ 16.)

Deputy Ramos's supervising lieutenant and captain reviewed and approved his use of force against Mr. Burt at issue in this case, as did the assigned sergeant from Division of Investigative Services. (*See* Exh. M (UOF Review Report); Exh. N, Lewis Depo., at 86:16-87:16.) The Department did not open an IA investigation into Deputy Ramos's use of force against Mr. Burt, much less impose discipline. (*Id*.)

## LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On summary judgment, a court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

The Ninth Circuit has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir. 1997) (as amended). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the reasonableness standard "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment. . . in excessive

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

force cases should be granted sparingly." *Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011).

## ARGUMENT

**I.      Deputy Ramos Is Not Entitled to Summary Judgment.**

   **A.      Ramos is Not Entitled to Summary Judgment on Plaintiff's Excessive Force Claim.**

Even a cursory review of the video evidence shows Ramos's motion for summary judgment on Plaintiff's excessive force claim borders on frivolous. Based on the video alone, a jury could easily conclude that Ramos threw Mr. Burt face-first to the ground for no legitimate reason. From the moment Mr. Burt stepped out of the truck after Ramos's traffic stop, he was calm and compliant: At Deputy Wilder's requests, he consented to a pat-down, willingly submitted to handcuffing, and answered every question put to him. At no point did he attempt to flee, resist, or threaten anyone. The situation escalated only after Ramos needlessly and aggressively inserted himself into the interaction and began peppering him with questions. When Mr. Burt exercised his right to stop answering questions, Ramos became enraged. When Mr. Burt swore at him, Ramos responded by throwing him face-first to the concrete with enough force to smash his teeth. On these facts, a jury could conclude that Ramos smashed Mr. Burt face-first for no legitimate reason. This is unquestionably excessive force. Further, Ramos's argument must fail because he rests on two "facts" that are most definitely disputed: (1) that Mr. Burt was flexing; and (2) the "controlled takedown" was minimal force.

   **1.  A Jury Could Find that Ramos Smashing Mr. Burt Face-First into the Sidewalk for No Reason is Unreasonable Force.**

A Fourth Amendment claim of excessive force requires an examination of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," which "requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S.

10

386, 396-97 (1989) (citations omitted). The strength of a government's interest is measured by examining three primary factors: (1) "the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others," and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. These factors are non-exhaustive and the Court can examine the totality of the circumstances, including the availability of less intrusive alternatives to the force employed. *Bryan v. Macpherson*, 630 F.3d 805, 826 (9th Cir. 2010); *Glenn v. City of Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011). "The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Bryan*, 630 F.3d at 826.

Ramos slammed Mr. Burt face first into the ground while he was handcuffed, smashing his front teeth and causing injuries to his shoulder, ribs and foot. Ramos's describes the maneuver as a "controlled take-down" and or "controlled movement" (Exh. B, 161:9-23), which only underscores the intentional nature of the force. The video clearly shows Ramos planting his right leg behind Mr. Burt, grabbing him and pulling him over his right leg to pull Mr. Burt off his feet before deliberately throwing him head-first into the ground. Ramos "controlled" Mr. Burt's face directly into the sidewalk.

In *Rice v. Morehouse*, 989 F.3d 1112 (9th Cir. 2021), the Ninth Circuit categorized a similar incident in which police officers used a "take-down" maneuver on a stopped motorist, throwing him face-first to the ground, as "substantial and aggressive." *Id*. at 1121. "Its use, like any, must be justified by the need for the specific level of force employed." *Id*., citing *Bryan*, 630 F.3d at 825. Taking the facts in the light most favorable to Mr. Burt, a reasonable jury could find that the state's interests were insufficient to justify throwing a handcuffed man face-first into the ground.

Ramos wrote in his use of force report that his actions were "necessary to defend self or another." But in considering "whether there was an immediate threat,

a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Mattos v. Agarano*, 661 F.3d 433, 441-42 (9th Cir. 2011) (*en banc*) (internal quotation marks and citation omitted). *See also Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011).

A reasonable jury could see this claim for what it is: a falsehood devised to justify the use of force after the fact that is entirely unsupported by the video evidence. By the time Ramos slammed Mr. Burt face first into the concrete, he had already been patted down for weapons and he was in handcuffs. Though his pants were falling down, visibly restricting his mobility causing him to struggle to keep pace as Ramos marched him towards the patrol car, he allowed himself to be led without pulling away or fighting Ramos. While Mr. Burt was cursing as he walked, at no point before the takedown did he make any verbal or physical threats towards Ramos or anyone else. In *Bryan*, the Court held that Bryan did not pose an immediate threat to the officer or bystanders because he was obviously unarmed and though he was shouting gibberish and expletives, at no point did he level a physical or verbal threat against the officer. 630 F.3d at 827. *See also Smith*, 394 F.3d at 702-03 (recognizing that even though the victim was shouting expletives, there was no threat leveled against the officer and a rational jury could very well find that he did not, at any time, pose a danger to the officers or others). The same is true of Mr. Burt. Crude and insulting language is not the same as a threat. A restrained, unarmed man struggling to hold up his pants does not present an objective danger justifying a take down.

Mr. Clark, Plaintiff's police practices expert, agrees. He found that Mr. Burt did not present a credible threat because he was handcuffed and in the presence of two trained, equipped and armored deputies. (Clark Dec. ¶ 11; *see also* Exh. J, Clark Depo., 80:17-21.) Mr. Clark described any threat Ramos may have felt as "subjective" and explained he saw "no objective reason for him to feel threatened."

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(*Id*. 80:22-81:5.) Ramos claims that a handcuffed person can still kick, headbutt, spit, bite or run. While this may be theoretically true, the video shows Mr. Burt doing none of these things in the moments leading up to the take-down.

Second, a jury could find that Ramos suspected Mr. Burt of only minor crimes that did not justify the level of force used against him. At the time Ramos executed the takedown, he had pulled over the car in which Mr. Burt was a passenger for a non-working brake light — a possible minor traffic violation by the driver, not Mr. Burt. *See Bryan*, 630 F.3d at 828 ("Traffic violations generally will not support the use of a significant level of force."). Ramos suspected Mr. Burt of, at most, throwing a glass pipe out of the car window. In *Rice*, the Court held that even though the officer suspected Rice of driving under the influence, that offense was not "particularly severe" for purposes of the *Graham* analysis. 989 F.3d at 1123. Even if Ramos believed that Mr. Burt was under the influence, such a minor offense does not justify the use of substantial force.

Finally, a jury could conclude that Ramos made no attempt to use less intrusive alternatives. Though officers "need not avail themselves of the least intrusive means of responding to an exigent situation," their failure to consider "clear, reasonable and less intrusive alternatives' to the force employed "mitigates against a finding the use of force reasonable." *Glenn*, 673 F.3d at 876.

Roger Clark found there was no need for Ramos to use any force and criticized Ramos's failure to use deescalation techniques. He criticized Ramos's decision to step away from Mr. Lotts and intervene in the interaction between Wilder and Mr. Burt in the first place. (Exh. J, 38:5-13.) Mr. Clark testified that Wilder was doing "just fine" with Mr. Burt when Ramos interrupted in a manner he described as "provocative" and "challenging." (*Id*. at 83:15-24.) Mr. Clark also criticized Ramos for resorting to force for alleged "flexing" rather than simply stopping and helping Mr. Burt address the issue of his pants falling down. (*Id*. at 62:7-14.) According to Mr. Clark, the fact Mr. Burt's pants were falling down was

13

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

obvious to Ramos. (*Id.* 62:1-6; 63:1-14.) Ramos's failure to use less intrusive alternatives was particularly egregious since the force Ramos did employ resulted in Mr. Burt's head being slammed to the ground. As Mr. Clark noted, "deputies should only use this extremely dangerous level of force where lower force levels are not available or ineffective, especially when the individual is already handcuffed…." (Exh. RC-A to Clark Dec., Clark Report, pp. 10-11.) Ramos's failures cut against his claim that the force inflicted upon Mr. Burt was reasonable. Ramos is not entitled to summary judgment on Plaintiff's excessive force claim.

### 2. Ramos's Argument in Support of His Motion for Summary Judgment Rests on Disputed or Irrelevant Facts.

Ramos attempts to bolster his "threat" narrative by pointing to Mr. Burt's conduct after he smashed his face into the concrete and to Mr. Burt's prior, unrelated arrests for which Ramos was not even present. Neither has any bearing on whether Ramos's use of force was objectively reasonable at the moment he used it, particularly since Ramos testified he did not know who Mr. Burt was before their interaction on December 18, 2022. (Exh. B, 173:22-174:3.) *See Graham*, 490 U.S. at 397 ("the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances **confronting them**, without regard to their underlying intent or motivation.") (emphasis added).

Moreover, Ramos's claim that Mr. Burt was attempting to escape is based on categorically disputed facts. Through his motion, Ramos argues that he slammed Mr. Burt to the ground because Mr. Burt turned his body right, causing Ramos to lose his grip on him. But Mr. Burt testified unequivocally that he did ***not*** turn or pull his body away from Ramos at any time:

> Q. Okay. And I am on page 9 now. He also claims that you are pulling your body to the – to the right. Do you recall pulling your body one way or the other?
>
> A. **Absolutely not**. I do know that I did not pull my body one way or the other to pull away from him. Like I said, this is not my first time. I know that is not the way to handle myself.

14

Q. Okay. So let me just clarify, you are not pulling at all?

A. **No, sir**.

(Exh. A, 48:20-49:4, emphasis added.)

Q. And next, the officer claims he was putting you up against the vehicle and claims you quickly turned to the right causing him to lose his grip. Would you agree with that?

A. **No. Absolutely not**.

Q. Okay. Do you recall turning to the right at all?

A. **Absolutely not**.

Q. Do you recall looking over your shoulder to try to address them?

A. **Absolutely not**. I have been escorted to the police car before, and I was - - I was adapting to him. He was the one in control moving me this way and that way. So I just went to where he guided me.

Q. Do you recall him losing his grip at any point?

A. **Absolutely not**.

(*Id*. 50:9-23, emphasis added; *see also* 70:4-7.) The Court must accept Mr. Burt's account because, contrary to Defendant's argument, the video does not "clearly contradict" it. *Rice*, 989 F.3d at 1123. Mr. Burt's testimony creates a direct, material, factual dispute that goes to the very heart of Ramos's justification for take-down and that precludes summary judgment. And it is consistent with Burt's behavior leading up to that point — a reasonable jury, weighing the totality of the circumstances, could conclude that a handcuffed man with his pants falling down, who made no attempt to run in the many minutes preceding the takedown, was not suddenly attempting to escape in the final seconds before Ramos threw him to the ground.

Ramos's fallback theory, that even if Mr. Burt was not actually trying to flee, he felt Mr. Burt tensing his muscles and interpreted that as an attempt to pull away, fares no better. Mr. Burt testified unequivocally that he did not even understand what Ramos meant when he said, "stop flexing" because it did not make sense, and

15

he was only "trying to comply with his orders and hold my pants up while I was handcuffed." (Exh. A, 48:10-15.) This is another disputed issue for the jury.

### B. Ramos Is Not Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim.

Ramos attempts to argue that he should be entitled to qualified immunity, but this argument is also frivolous in light of the video evidence and Mr. Burt's testimony. There is no question that caselaw puts Ramos on clear notice that smashing Mr. Burt face-first to the pavement for no reason other than that Mr. Burt was swearing at him is unconstitutional, and indeed cases involving take-downs of motorists are very similar.

Courts do not require cases with identical fact patterns to find the law clearly established for purposes of qualified immunity. In *Sampson v. Cnty. of Los Angeles by & through Los Angeles Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012 (9th Cir. 2020), the Ninth Circuit observed the factual differences in the cases did not mean controlling law failed to give defendants adequate notice. *Id.* at 1020-21. Likewise, in *Ballentine v. Tucker*, 28 F.4th 54 (9th Cir. 2022), the Court noted that factual differences in the conduct of the defendant official did not render precedent inapplicable. *Id.* at 66. "The question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) (citation omitted). "Officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ballentine*, 28 F.4th at 68, quoting *Ford v. City of Yakima*, 706 F.3d 1188, 1194 (9th Cir. 2013), abrogated on other grounds by *Nieves v. Bartlett*, 587 U.S. 391 (2019). Where a case "involve[s] the kind of mere application of settled law to a new factual permutation, we assume an officer had notice that his conduct was unlawful." *Id.* (citation and quotation marks omitted).

16

It is clearly established one's "right to be free from the application of non-trivial force for engaging in mere passive resistance." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013); *see also Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (explaining that cases dating back to 2001 established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"). The Ninth Circuit has held this even when the extent of the resistance was substantially greater than the mere verbal protests exhibited by Mr. Burt here. *See., e.g., Young*, 655 F.3d 1156, 1165-66 (9th Cir. 2011) (arrestee's repeated refusal to reenter vehicle at officer's command is not active resistance); *Bryan,* 630 F.3d at 829–30 (arrestee's cursing and muttering and exiting his vehicle despite being told to stay in car was not active resistance); *Davis v. City of Las Vegas,* 478 F.3d 1048, 1055–56 (9th Cir. 2007) (arrestee's actions in physically impeding the officer's search of his pockets was not active resistance); *Smith,* 394 F.3d at 703 (arrestee's refusal to remove hands from pockets and his reentry of his home despite officers' orders to place hands on head and walk towards them was not active resistance).

Despite Ramos's attempts to differentiate *Rice*, *supra*, the facts here are remarkably similar. In *Rice*, an Idaho State Police Officer, Janet Murakami, pulled over Lee Arthur Rice II for failing to signal for a full five seconds before changing lanes. 989 F.3d at 1116. Murakami also suspected Rice was driving under the influence. *Id*. Rice showed Murakami his driver's license through the window but refused to hand over his registration and insurance and repeatedly asked to speak with Murakami's supervisor. *Id*. Murakami radioed for back up and approximately a dozen officers responded. *Id*. at 1116-1117.

When backup arrived, officers pulled Rice from his car. *Id*. at 1117. Two officers, Morehouse and Schaffer, held Rice in a "police lead" position, with one gripping each of his arms. *Id*. As they walked him towards the rear of the car, although Rice maintained he did not resist officers, Morehouse and Schafer tripped

17

Rice and forcibly threw him face-first onto the pavement using a "take-down" maneuver. *Id*. He suffered extreme immediate pain and long-term physical injury from the take-down. *Id*. at 1116-17. The Ninth Circuit held that the officers were not entitled to qualified immunity for tripping Rice and throwing him face-first into the pavement during his arrest. *Id*. at 1126. Taking Rice's version of events as true, the Court found that a jury could conclude that the takedown amounted to excessive force in violation of the Fourth Amendment, and that the right was clearly established at the time of the December 2011 arrest. *Id*.

Notably, the Court concluded that the right was clearly established from a body of cases whose underlying facts look nothing like the roadside takedown at issue in the case. In *Deorle v. Rutherford*, an officer shot a beanbag projectile at a suicidal man who had complied with instructions to put down his crossbow but continued walking toward him. *Id*. In *Headwaters Forest Defense v. Humboldt*, officers pepper-sprayed non-violent environmental protestors. *Id*. In *Young v. County of Los Angeles*, an officer physically struck and pepper-sprayed a man who refused to re-enter his vehicle. *Id*. And in *Bryan v. MacPherson*, an officer tased a man who, although shouting gibberish, swearing, hitting himself and disobeying orders to reenter his car, was otherwise non-resistant. None of these involved tripping the suspect and throwing him face first into the ground while his hands were restrained and the specific mechanisms of force employed bore no resemblance to what happened to Rice. But the Court denied qualified immunity, holding that these cases together formed a body of relevant case law placing the use of substantial force against a passively resisting person "beyond debate." *Id*.

Following *Rice*, it is beyond dispute that it is clearly established that a takedown of a handcuffed detainee who states they were not resisting, forcing them face-first to the ground, violates the law. Like Rice, Burt was handcuffed and denies offering any resistance beyond declining to repeat his answers to questions and using profanity when objecting to being yelled at. As in *Rice*, Ramos nonetheless

18

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

used a takedown to throw the handcuffed Mr. Burt face-first into the ground. That is, if anything, a more direct factual analog to Rice's takedown than *Deorle*'s beanbag round or *Headwaters*' pepper spray ever were. Ramos cannot argue that *Rice* fails to clearly establish the right here by pointing to differences in technique or context, because *Rice* itself was decided on precedent even further afield. If those cases were sufficient to place the officers in *Rice* on notice that their conduct was unconstitutional, then *Rice*, a case involving substantially similar facts, provides even clearer notice to Ramos. Because it is "beyond debate" that Ramos's conduct violated clearly established law, he is not entitled to qualified immunity.

**C. Ramos is Not Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim.**

Because the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's § 1983 claims under the Fourth Amendment survive summary judgment also mandates that the assault and battery claims similarly survive. *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012). An assault and battery claim against a police officer requires Plaintiff to establish that the force employed was unreasonable. *Edson v. City of Anaheim,* 63 Cal. App. 4th 1269, 1272 (1998); *Finley v. City of Oakland,* No. C 04-5102 MEJ, 2006 WL 269950 at *14 (N.D. Cal. Feb. 2, 2006).

Ramos argues that he cannot be held liable for assault and battery under California Government Code, section 820.2. But it has long been established that this provision does not apply to officers who use unreasonable force in making an arrest. *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007), citing *Scruggs v. Haynes,* 252 Cal.App.2d 256 (1967) ("[A] peace officer making an arrest is liable to the person arrested for using unreasonable force.") and *Robinson v. Solano County,* 278 F.3d 1007, 1016 (9th Cir. 2002) (*en banc*) ("California denies immunity to police officers who use excessive force in arresting a suspect.").

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## D.    Ramos is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claim.

Based on the factual record, a jury could easily conclude that Ramos used force on Mr. Burt in retaliation for Mr. Burt criticizing and swearing at him — conduct that, while perhaps not polite, nonetheless remains constitutionally protected speech.

To prevail on his retaliation claims, Plaintiff must show (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *See Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). Plaintiff can easily show he was engaged in constitutionally protected activity. A citizen has the right to remain silent in response to police interrogation. U.S. CONST. amend. V ("No person. . . shall be compelled in any criminal case to be a witness against himself."); *see also Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.").[2] Ninth Circuit law also clearly

---

[2] Ramos wrongly suggests that "the first Amendment does not protect speech involving a refusal to identify oneself during a lawful investigative detention," citing *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177 (2004). Ramos Mot. at 18:3-5. *Hiibel* addressed only whether a specific Nevada statute requiring people to provide identification when subject to a lawful detention violated the constitution. But as courts have recognized, "*Hiibel* addressed a Nevada law to which there is no California analogue" because "there is no requirement under California law that a person being detained provide an identifying document." *Noble-Perez v. Robinson*, No. 822CV00037JVSJDEX, 2023 WL 6194265, at *8, *9 (C.D. Cal. Aug. 16, 2023). Since he was not driving, Burt was under no obligation to provide his identity. He did so anyway — and once he did, was

20

establishes Mr. Burt's right to verbally challenge Ramos, even through use of profanity. *Mackinney v. Nielson*, 69 F.3d 1002, 1007 (9th Cir. 1995).

In *Duran v. City of. Douglas*, 904 F.2d 1372 (9th Cir. 1990), the Ninth Circuit denied qualified immunity to an officer on a claim he arrested the plaintiff in retaliation for him making "obscene gestures toward [the officer] and yelling profanities." *Id*. at 1377. As the Ninth Circuit observed:

> Inarticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom he had just had a run-in. As such, it fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—is categorically prohibited by the Constitution.

*Id*. at 1378. The Ninth Circuit held that it clearly established that government officials, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. *Id*. "Surely anyone who takes an oath of office knows—or should know—that much." *Id*.

Ramos incorrectly argues that Plaintiff cannot establish retaliatory animus as the motivation for his slamming Mr. Burt face first into the concrete. But the "substantial or motivating factor" element of a retaliation claim "may be met with either direct or circumstantial evidence." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002). As set forth above, Ramos throwing Mr. Burt face-first into the ground was objectively unreasonable because Mr. Burt was suspected only of a minor crime and was not threatening anyone or trying to flee at the time the force was inflicted. *See* Section A, *supra*. If a jury concludes that there was no legitimate justification for Ramos's actions, it could reasonably infer that those actions were motivated by retaliatory animus. *Sanderlin v. Dwyer*, 116 F.4th

certainly under no further obligation to answer their questions and was free to invoke his right to remain silent.

21

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

905, 911 (9th Cir. 2024). Based on the aggressive tone of voice Deputy Ramos takes on as soon as Mr. Burt begins cursing and refusing to answer questions, and his abrupt decision to pull Mr. Burt to his feet and push him roughly toward the patrol car, a jury could easily conclude that Ramos was acting out of rage at Mr. Burt's refusal to answer questions and his swearing at him, notwithstanding Ramos's denial in his deposition that he was angry. (Exh. B, 149:10-18; 174: 15-25.)

Additionally, "the timing of an allegedly retaliatory action can serve as circumstantial evidence of a retaliatory intent for the action." *Naveed v. City of San Jose*, No. 15-cv-05298-PSG, 2016 WL 2957147, at *5 (N.D. Cal. May 23, 2016) (citation omitted); *see also Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 744 (9th Cir. 2001) (explaining that a short "proximity in time between the protected action and the allegedly retaliatory [conduct]" is evidence that supports a First Amendment claim). Here, Ramos escalated the situation into a use of force within seconds of Mr. Burt declining to answer further questions and swearing at him. A reasonable jury could find that Ramos was not attempting to de-escalate the situation at all and instead was reacting in rage and punishing Mr. Burt for exercising his rights. *Ulrich*, 308 F.3d at 981 (denying summary judgment on retaliation claim where alleged retaliation "came close on the heels of his protected speech activity" and where "presented evidence from which a jury could conclude that [defendant's] stated reason for [the allegedly retaliatory conduct] was false and pretextual.")

Ramos suggests that he merely responded lawfully to Mr. Burt's refusal to identify himself, but that is wrong as both a factual matter and legal proposition. First, it is incorrect as a factual matter, because Mr. Burt ***did*** identify himself to the officers, ***twice*** — even spelling his name and providing his date of birth and his street address. Only then did he exercise his right to stop answering questions. Second, as a matter of law, while Ramos points to cases upholding statutes that require people to produce identification when lawfully detained in an investigation

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(a law California does not have) — Ramos points to no case holding that officer responding to a person who refuses to identify themselves may throw the person face first into the ground and shatter their front teeth. A reasonable jury could conclude that Ramos's violent takedown of Mr. Burt had nothing to do with identification at all, and everything to do with punishing him for exercising his constitutional right to remain silent and for swearing at him. Even if Ramos's self-serving assertion were credible, the mere "possibility that other inferences could be drawn [regarding the officers' motivations] that would provide an alternate explanation for the [officers'] actions does not entitle them to summary judgment." *Mendocino,* 192 F.3d at 1303. "This issue is for the trier of fact, not for [the Court], to resolve." *Ballentine*, 28 F.4th at 63. Ramos is not entitled to summary judgment on Plaintiff's retaliation claim.

**E.      Ramos is Not Entitled To Summary Judgment on Plaintiff's Bane Act Claim.**

To prevail on his Bane Act claim, Plaintiff must establish (1) that Ramos by threat, intimidation, or coercion, interfered (or attempted to interfere) with Mr. Burt's exercise or enjoyment of his First Amendment right criticize the police and to refuse to answer questions, *or* acted violently against Mr. Burt to retaliate against him for having exercised his rights; (2) that Ramos acted with reckless disregard for Mr. Burt's rights; (3) that Mr. Burt was harmed; and (4) that Ramos's conduct was a substantial factor in causing Mr. Burt harm. *See* CACI 3066 (2026 rev.).

The act of throwing a handcuffed man to the ground onto his face satisfies the "threat, intimidation or coercion" element of a Bane Act claim. *See Reese v. Cnty of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City and County of San Francisco,* 17 Cal. App. 5th 766, 799 (Cal. Ct. App. 2017). While a Bane Act claim requires a showing of a "specific intent" to violate the arrestee's right to freedom from unreasonable seizure, "reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

rights." *Id.* at 1045 (*quoting United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). *See also Pashuta v. City of San Diego*, No. 319CV2386CABBLM, 2020 WL 1550217, at *4 (S.D. Cal. Apr. 1, 2020). Because, as amply shown above, a jury could find that Ramos showed a "reckless disregard" for Mr. Burt's right to criticize the police and to be free from unreasonable force, that is sufficient to meet the "specific intent" requirement under *Cornell* and *Reese*.[3]

Ramos wrongly suggests that the Court should consider whether he is entitled to qualified immunity on Plaintiff's Bane Act claim. (Ramos Mot. at 25:14-17.)  California courts have expressly held that qualified immunity does not apply to claims under the Bane Act. *See Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1243–1244 (2007) (*Venegas II*) (finding no basis in the legislative history of Civil Code section 52.1 to conclude that the Legislature intended the federal doctrine of qualified immunity to apply to Bane Act claims). Ramos is not entitled to summary judgment on Plaintiff's Bane Act claim.

## II.     The County is Liable for Ramos's Excessive Force under *Monell*

"To impose *Monell* liability on a municipality under Section 1983, [a] plaintiff must prove: (1) [he] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (quotation omitted). To establish a "policy" for purposes of *Monell* liability, a plaintiff can show that the municipal employee acted "pursuant to an expressly adopted official policy, longstanding practice or custom, or as a final policymaker." *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).

---

[3] *Est. of Nunez by & through Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867, 887 (S.D. Cal. 2023) held that "specific intent" was evidenced by the defendants' disregard of the plaintiff's rights by forcing him into handcuffs and escalating the force necessary to take custody of plaintiff for his mental health evaluation and ignored signs of medical distress.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.   The County Has a Custom and Practice of Tolerating Excessive Force, Particularly Against Restrained Individuals

To prevail on a *Monell* claim, a plaintiff "need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019). "A plaintiff can 'establish the existence of an unconstitutional practice or custom,' such as 'an informal but widespread custom of using excessive force,' through 'evidence of a recurring failure to investigate and discipline officers for' such violations.'" *Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018, 1028 (N.D. Cal. 2022) (quoting *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1235 (9th Cir. 2011)). The Ninth Circuit has explained how, under *Monell,* "a local government body can be held liable under § 1983 for policies of inaction as well as policies of action." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014):

> [A] policy of inaction is based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." In inaction cases, the plaintiff must show, first, "that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right." This requires showing that the defendant "was on actual or constructive notice that its omission would likely result in a constitutional violation." Second, the plaintiff must show "that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy."

*Id*. (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185–86 (9th Cir. 2002), citations omitted).

Here, the record provides ample evidence for a jury to conclude that the County has a *de facto* policy of tolerating excessive force and failing to adequately discipline officers who use force in violation of law or policy, particularly with respect to officers who use of excessive force on restrained individuals. The County should have known that this policy would result in constitutional violations based on a pattern of uses of unconstitutional force that went undisciplined but led to large

25

payouts or headlines. And had the Department not failed to discipline Ramos for a previously similar use of excessive force, he likely never would have used excessive force on Mr. Burt.

**1. The Sheriff's Department almost never finds force out of policy.**

The Sheriff's Department's own data and discovery responses show that, despite its supposedly thorough procedures for reviewing uses of force,[4] from January 1, 2020 to December 31, 2022 (about the three years leading up to Ramos's use of force on Burt on December 18, 2022) the Department hardly ever opened investigations into uses of force, and almost *never* found any use of force to violate the law or Department policy — out of 10,356 incidents in which deputies used force over the three-year period, the Department opened only 21 investigations (0.20% of incidents) and found only 3 uses of force out of policy (0.029% of the time, or 1 in 3,452 incidents).

Plaintiff's police practices expert, Roger Clark, opined that these rates of investigating and correcting force are so low that it demonstrates a failure to supervise force:

> The number of use-of-force incidents that SDCSD found out of policy is miniscule and utterly unrealistic. Uses of force by definition do not happen in a carefully controlled fashion, and deputies are human and make errors. For SDCSD to find that in a large, urban law enforcement agency of approximately 2,500 sworn deputies, deputies use force correctly in 99.97% of incidents means either that SDCSD deputies

---

[4] As the County asserts in its motion, SDCSO procedures call for "[e]very use of force, regardless of whether there is a complaint, … to be reported and reviewed by several levels in the deputies' chain of command and the Division of Inspectional Services." County MSJ Memo. at 4:17-19. But the County's Rule 30(b)(6) designee testified that the Sheriff's Office has no policy, guidelines, or training on how supervisors should conduct their review of deputies' use-of-force reports. (Exh. S, Nguyen Depo. at 27:25-29:6.)

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

employs angels not people, or that SDCSD as a matter of practice regularly tolerates excessive uses of force.

… The fact that [deputy UOF] reports result in such a miniscule number of IA investigations into uses of force (the 6, 10 and 5 investigations opened in the three years above reflects both civilian complaints and internally generated complaints) shows that this routine process for reporting and review of use of force is simply a paper tiger — a bureaucratic exercise designed to provide the illusion of supervision without exercising any meaningful review or restraint on excessive force and fails to investigate wrongdoing.

Clark Dec. ¶¶ 26-27.

| | 2020 | 2021 | 2022 | 3-yrs. |
|---|---|---|---|---|
| Use-of-force incidents[5] | 3,454 | 3,420 | 3,482 | 10,356 |
| IA investigations opened into UOFs[6] | 6 | 10 | 5 | 21 |
| Sustained findings of out-of-policy UOF[7] | 2 | 1 | 0 | 3 |
| % UOF incidents with IA investigation | 0.17% (1 in 576) | 0.29% (1 in 342) | 0.14% (1 in 696) | 0.20% (1 in 493) |
| % UOF incidents found out of policy | 0.058% (1 in 1,727) | 0.029% (1 in 3,420) | 0% | 0.029% (1 in 3,452) |

Clark notes that most departments do not publish numbers of out-of-policy force determinations, but provides an illustrative sample of a few for comparison: LAPD had 2,200 "non-categorical" (non-deadly) uses of force from 2020 to 2022, and found between 110 and 148 out of policy each year, **a rate about forty times higher than SDCSO.** *Id.* ¶ 28. LAPD found force tactics out of policy at an even higher rate, **a rate about 100 times greater than SDCSO.** *Id.* Sacramento Police Department found uses of force out of policy in more than 5.5% of incidents, **a rate**

---

[5] *See* Exh. F at 4 (CSD4138); Exh. G at 4 (CSD 4149).
[6] See Exh. H at 7 (CSD4131); Exh. I at 8 (CSD 4164); Exh. N, Lewis Depo. at 81:23-82:14.
[7] Exh. T at 3-5 (responses to Interrogatory 10); Clark. Dec. at ¶ 26.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**nearly 200 times that of SDCSO**. *Id*. ¶ 29. Clark also noted that the Albuquerque Police Department, when it was under a federal consent decree due to a pattern of constitutional violations, announced that it had reached a milestone of compliance the rate at which its officers' uses of force had been found out of policy had dropped to only 5%, a rate about 170 times greater than the 0.029% of the County's uses of force it found out of policy. *Id*. ¶ 30.

The County suggests that, as a categorical rule, a plaintiff "cannot establish an unconstitutional pattern or practice and/or a failure to discipline based on a statistical analysis of the San Diego Sheriff's Office's use of force statistics." County Mot. at 16:3-5. This fails here for two reasons: first, Plaintiff offers not only statistical evidence, but also specific cases involving excessive force, below. But second, none of the cases the County cites involve the stark figure at issue here — that a large metropolitan Sheriff's department, over a three-year period, found on average *only one use of force out of policy each year*, a rate of 0.029%.

For example, the County points to *Strauss v. City of Chicago*, 760 F.2d 765, 768 (7th Cir. 1985), plaintiff argued that a police department that sustained "only six to seven percent of all registered complaints filed … must give rise to a reasonable man's suspicions that defendant['s] methods of review are weighted to discourage positive findings." *Id.* at 768. The court rejected the argument "specious," reasoning that "the number of complaints filed, without more, indicates nothing" because "[p]eople "may file a complaint for many reasons or no reason at all." *Id.* at 768-69; *accord Hocking v. City of Roseville*, No. CIVS060316RRBEFB, 2008 WL 1808250, at *5 (E.D. Cal. Apr. 22, 2008). *Straus* involved statistics relating to a low percentage of *complaints* (which the court emphasized might be inflated by meritless complaints), not total uses of force. And Straus involved a rate of sustained complaints of "six to seven percent" — a rate ***more than two hundred times higher*** than the 0.029% rate at which SDCSO finds uses of force out of policy here. *See also Bryant v. Whalen*, 759 F. Supp. 410, 421, 423 (N.D. Ill. 1991)

28

(rejecting argument that "extremely low percentage of complaints the OPS sustains" provided evidence of deliberate indifference, where department "[took] in approximately 2000 excessive force complaints each year, and sustains 6.2%, or about 125, of these complaints").

Similarly *Hocking*, which the County cites, rejected a statistical analysis of unfounded civilian complaints on grounds that many complaints might be meritless, but distinguished the Ninth Circuit's decision in *Larez* in part on grounds that the *Larez* plaintiff provided expert testimony that it was "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen." 2008 WL 1808250, at *6 (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991)).

Here, unlike in *Strauss, Bryant*, or *Hocking*, Plaintiff compares the low number of out-of-policy determinations to the total number of uses of force. There is no concern that the percentage might be artificially decreased by a large number by frivolous complaints. More importantly, the rates at which the Department finds force out of policy is shockingly low. Plaintiff does argue that the rate is "six to seven percent" but should be higher — the Department finds only one in approximately 3,500 uses of force out of policy, about one each year, a rate about 100 lower than other Departments.

The fact that the County finds such a vanishingly small number of its deputies uses of force to be out of policy — on average only one each year — takes this evidence out of the realm of statistics and allows the clear observation that because "uses of force by definition do not happen in a carefully controlled fashion, and deputies are human and make errors," a Department with 3,500 uses of force each year that is putting meaningful limits on force should find more than one use of force each year has violated policy. As plaintiff's expert Roger Clark explains:

> I am not a statistician, and the comparisons above are not intended to demonstrate precise statistical conclusions. I am, however, an expert on police practices and procedures, and the comparisons unquestionably

29

PLAINTIFF'S CONSOLIDATED OPPOSITION TO<br>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

support my overall view that the rates at which SDCSD conducts formal IA investigations into uses of force and finds uses of force out of policy are so far below what would be expected of a law enforcement agency its size with as many uses of force as SDCSD officers report that the only reasonable conclusion is that the agency simply turns a blind eye and has a practice of failing to investigate and discipline officers for excessive force.

Clark Dec. ¶ 31. Certainly, as in *Larez*, and unlike in *Hocking*, Plaintiff's evidence shows that it is "almost impossible for a [deputy] to suffer discipline" as the result of a use of force. *Id.* ¶ 32 ("From a deputy's perspective, the Department almost never finds uses of force out of policy … so there is almost no risk that using excessive force will have any consequence….").

### 2. The Sheriff's Department has paid out tens of millions of dollars in dozens of excessive force cases.

Despite almost never finding its deputies' uses of force to be out of policy, the Sheriff's Department has cost the County tens of millions of dollars in litigation over excessive force paid out to dozens of plaintiffs — far more than the handful of incidents in which the Department finds force out of policy.

According to public records posted on the County's website, from January 1, 2014, to July 1, 2024, the County paid out more than $35 million in settlements in cases alleging wrongful use of force. Bibring Dec., ¶¶ 14-15 & Exh. L. This amounts to more than $3.4 million per year on average over the 10.5 year period, paid to 50 different plaintiffs — an average of nearly 5 per year. *Id.* These payouts clearly place the Department on clear notice that the vanishingly small number of incidents in which it finds force out of policy do not reflect the rates at which its deputies use of force unlawfully.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### 3. The Sheriff's Department has been subject to a pattern of lawsuits alleging excessive physical force, both generally and against restrained individuals specifically.

In addition to the enormous litigation payouts, Plaintiff has also identified specific incidents of excessive physical force used against subjects, including eight against subjects who were handcuffed or restrained:

In *Bell v. Cty. of San Diego*, No. 14-CV-1767-H (MDD), the plaintiff alleged that deputies used force against him while he was handcuffed: "With BELL in handcuffs, while lying on his stomach, DEFENDANTS used dark metal blunt objects to hit BELL … and purposefully punched BELL in the face." (County RJN Exh. 1, ¶¶ 23, 24).

In *Fisher v. County of San Diego*, No. 09cv2572 JM(BGS), the plaintiff alleged that a deputy "grabbed both of [Plaintiff's] hands" then "pushed Plaintiff Forward, causing him to fall face down onto the parking lot pavement," then punched him in the back of the head after he was handcuffed. (County RJN, Exh. 2 ¶ 10.)

The County acknowledges that *Jimenez v. County of San Diego*, No. 15-CV-02299-L-JLB, involved use of force against Jimenez while he was handcuffed, but attempts to distinguish on grounds that the for "far exceeds that at issue here as it involved allegations that a Deputy 'grabbed Jimenez by the throat, slammed Jimenez' head against the wall of the hotel guest hallway, and then brutally threw Jimenez down onto the floor of the hotel guest hallway…'" (RJN, Exh. 10 ¶ 26.) But the fact that the case involves a greater use of force only means the County should have been on clearer notice of a pattern of excessive force against individuals who are handcuffed or restrained. The County settled *Jimenez* for $500,000. (Exh. L, Settlements PRA at 20.)

In *Martinez v. County of San Diego*, 20-CV-860 BEN KSC, plaintiffs alleged that a deputy walking one handcuffed plaintiff "shoved [him] headfirst into [a] fence." (County RJN, Exh. 9, ¶ 14.) When his son (who was handcuffed on the

31

ground) objected, saying, "Hey dude, com on bro," another deputy "struck [him] in the face multiple times with an open palm." (*Id.*)

In *Myles v. County of San Diego*, 15-CV-1985-BEN (BLM), plaintiff Mickail Myles, alleged that he had committed no crimes but was placed in handcuffs when he asked the officers what was happening. Hearing no response, Mr. Myles turned to look over his shoulder when an officer "beat him about the head with a club" and used dog to bite. (County RJN, Exh. 11, ¶ 18). A jury awarded *Myles* $5 million in October 2022, just months before Ramos's use of force on Burt. Exh. V (*Myles* verdict); Dorian Hargrove, Jenny Day, *Jury awards $5M to man beaten by San Diego Sheriff's Deputies and attacked by K-9 in 2014*, CBS 8 News (Oct. 11, 2022). This highly publicized verdict put the Department on notice about its failures properly limit use of force on handcuffed individuals.

*Steinmeier v. County of San Diego*, No. 18-CV-1603 JM (WVG), alleged that deputies encouraged a police dog to bite a woman after they handcuffed her, injuring her severely, then when the subject's wife kicked at the dog in order to stop the unjustified attack, deputies handcuffed hit her on her back and head multiple times with a fist and what she believed was a flashlight. (County RJN, Exh. 6, ¶¶ 13–18.)

The County's opposition also references another lawsuit alleging Deputy Peraza beat Miguel Villa with a closed fist while he was in restraints. The County paid $199,000 to settle that case in April 2021. (Exh. L, Settlements PRA at 41; Exh. W (*Villa* complaint).)

In addition to those lawsuits, in March 2022, just months before Ramos used force on a handcuffed Burt, a jury found that a San Diego deputy used excessive force in pressing Lucky Phounsy's head down while he was in maximal restraints, resulting in his death. The found that the deputy acted maliciously, oppressively, or in reckless disregard to Mr. Phounsy's rights, and awarded $80 million in damages, a verdict that made national news. *See K.J.P. v. Cnty. of San Diego*, 621

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

F. Supp. 3d 1097, 1113 (S.D. Cal. 2022); Josh Campbell, Elizabeth Joseph, *Federal jury awards $85 million to California family in wrongful death lawsuit after arrest*, CNN (Mar. 19, 2022), https://www.cnn.com/2022/03/19/us/san-diego-lucky-phounsy-wrongful-death-lawsuit.

Finally, the County also paid a substantial sum to settle litigation over a strikingly similar use of force by Defendant Deputy Ramos himself. In the *Strode* case, Defendant Ramos used a very similar takedown against Joshua Strode, which the video evidence clearly shows as excessive force. The Sheriff's Department investigated, found Ramos's use of force on Strode to be within policy, then paid more than $130,000 to settle an excessive force case filed by Strode. (Exh. L. at 38.) As Plaintiff's expert explains:

> Deputy Ramos's violent takedown of Strode, and smashing his head into a wall, was clearly excessive force not justified by any perceived threat. But Internal Affairs investigated the use of force and found it within policy, finding fault only with Ramos's communication and issuing a written reprimand – a degree of discipline so minimal it is tantamount to no discipline at all. …

> [C]onsistent with the Department's policy of tolerating excessive force, neither the investigator nor the supervisors who reviewed the investigation found the force out of policy or imposed any meaningful corrective action — a lamentable failure to correct excessive force that provides clear illustration of the Department's tolerance of physical abuse. This systemic failure to discipline, part of the department's pattern and procedure, … is manifested in the unjustifiable exoneration of Ramos despite clearly excessive and unjustifiable force gave rise directly to Ramos's subsequent violation of Mr. Burt's rights.

Clark Dec., ¶ 33.

In addition to these nine cases involving force on restrained individuals Plaintiffs identified additional cases involving excessive physical force. In *Carr v. County of San Diego*, 19-CV-1139 JLS (MDD), sheriff responded to a call regarding a diabetic man in medical distress due to low blood sugar, and responded by placing him in a headlock, slamming him to the ground, using a Taser,

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

handcuffing him, then dragging him to the curb, and pepper spraying him in the face. (County RJN, Exh. 8 at ¶¶ 40, 42.) The County settled the case for $196,500. (Exh. L (Settlements PRA), at 8.) In *Marcial Torres v. County of San Diego*, No. 15-CV-01151-CABBLM (S.D. Cal. 2015), alleged that deputies tased plaintiff repeatedly, then failed to provide aid, ultimately settling with the County for $3 million. (County RJN, Exh. 3; Exh L, Settlement PRA at 39.) And in *Silva v. County of San Diego*, 18-CV-02282-L-MSB (S.D. Cal.), deputies beat, tased and ultimately killed a mentally ill man in jail who had committed no crime. (County RJN, Exh. 5 ¶¶ 96–113.) The County settled that litigation for nearly $3.5 million. (Exh. L, Settlement PRA at 35.).

The County argues that evidence of prior violations must be "substantially similar in character" to Plaintiff's claims in order to support *Monell* liability. County MSJ at 19:7-9. But the law does not blindly require identical facts — tracing the cases the County cites back shows that they rely on the Supreme Court's principle in *Connick* that the pattern of violations a case alleging liability due to municipal inaction must be sufficiently similar to put the municipality on notice of the deficiencies of its *de facto* policy:

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997), citations omitted). Here, there is no question that the specific incidents Plaintiff identifies easily allow a jury to conclude the County was on

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

notice of a *de facto* practice of failing to discipline for excessive force generally, particularly for excessive force on handcuffed or restrained individuals.

Taken together, the sum of this evidence — that the Department finds on average only one use of force out of about 3,500 each year out of policy; that it pays an average of $3.5 million to five plaintiffs each year to settle excessive force lawsuits; and the specific instances of excessive force pointed to here — together easily provide sufficient "evidence of a recurring failure to investigate and discipline officers" *Hunter*, 652 F.3d at 1235, for a jury to find the County liable under *Monell*.

**B.    The County failed to discipline Ramos for nearly identical use of excessive force on Joshua Strode**

Deputy Ramos's use of force on Mr. Burt was not the first time he used an aggressive, unjustified takedown. In 2017, Deputy Ramos used a similar tactic on Joshua Strode, a detainee at San Diego County jail. When Strode complained, the Department investigated and found Ramos's use of force to be within policy, although it reprimanded Ramos for failing to communicate effectively. Strode filed a lawsuit, which the Department settled.

The Strode incident not only demonstrates a causal connection between the County's failure to discipline and Ramos's use of force. It also makes the County liable under *Monell* for a second, independent reason: the decision not to discipline Ramos was reviewed and approved by the Sheriff (a policymaker for the Department), the Department is responsible for its failure to supervise Ramos based on that incident alone.

**1.  Deputy Ramos's aggressive 2017 takedown of Joshua Strode**

On June 2, 2017, San Diego State University police arrested Joshua Strode ████████████████ and transported him to San Diego County jail. SDSU Officer Carrie Hogan described in a supplemental report filed to memorialize Ramos's use of force:

35



Exh. O (emphasis added). Officer Hogan noted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*)

As with Ramos's take-down of Mr. Burt, the videos provide powerful evidence from which a jury could unquestionably find the force unlawful. Videos of the incident captured by Officer Hogan's body-worn camera and the jail CCTV system both confirm Officer Hogan's account and clearly convey the character of Ramos's aggression — stunning in both its violence and its lack of any justification. See Exhs. P (Officer Hogan BWC) & Q (CCTV video):

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

[REDACTED]

Strode filed a complaint with the Department, which opened an Internal Affairs investigation in response. The investigating sergeant [REDACTED] . The investigator noted that [REDACTED] [REDACTED] :

Exh. R at 12 (CSD002027). Nonetheless, the investigating sergeant *exonerated* Ramos of the charge he used excessive force, finding "[REDACTED]

37


." *Id.* at 14 (CSD002029). The investigation did sustain one charge against Ramos for "████" in that he "████████████" because he "████████████." *Id.* For this violation, the Department imposed a written reprimand. Exh. U. Strode filed a lawsuit, which the Department settled for $130,708.23. County RJN, ECF No. 80-2, Exh. 14 (notice of dismissal); Exh. L at 39.

### 2. A jury could reasonably conclude that Department failed to discipline Ramos for his use of excessive force on Strode, and that the Sheriff approved that failure

The County cannot contest the facts surrounding Deputy Ramos's use of force on Strode. Based on the video evidence and the testimony of Plaintiff's expert, a jury could reasonably find that Ramos's use of force on Strode violated the constitution. And the County also cannot contest that its investigation found the use of force to be within policy and issued Ramos a written reprimand only for his failure to communicate.

As the County's designee pursuant to Rule 30(b)(6) testified, once an IA investigation is complete, the IA sergeant memorializes their investigation in a report that summarizes evidence makes findings on whether the subject deputy's conduct was within law and policy, but does not make recommendations on discipline for any sustained findings. (Exh. S, Nguyen Depo., at 59:16-60:25.) The IA officer's report will go to the subject deputy's supervisor, as well as the subject's second-level supervisor (two levels up the chain of command) who decides in the first instance what discipline should be imposed based on any sustained findings. (*Id.* at 62:22-63:16.) The second level supervisor can also overrule the findings on a charge if they disagree. (*Id.* at 63:17-64:9.)

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The County's Rule 30(b)(6) designee also testified that all formal discipline, including written reprimands, are reviewed by the chain of command up to and including the Sheriff. (*Id*. at 64:17-65:9, 73:8-74:12.) Each of those reviewers can overrule the findings of the lower ranks: if they think a sustained charge should not be sustained they can overrule it; and if they think a finding that was not sustained should be sustained, they can sustain the finding and issue discipline. (*Id.* at 65:10-66:2.)

A municipality also can be liable for an isolated constitutional violation if the final policymaker "ratified" a subordinate's actions. *See Cty. of St. Lewis v. Praprotnik,* 485 U.S. 112, 127 (1988). Ordinarily, ratification is a question for the jury. *See Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995). To show ratification, a plaintiff must show that the final policymaker made a deliberate choice from among various alternatives to follow a particular course of action. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (per curiam). "The policymaker must have knowledge of the constitutional violation and actually approve it." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). Where a policymaker is liable for ratification of failure to discipline, the municipality is also liable. *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991) (holding that city's liability "hinges on" police chief's official capacity liability in ratifying and failing to discipline officers' actions); *see also Blankenhorn*, 485 F.3d at 485–86 (describing *Larez*); *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998) (upholding denial of qualified immunity to police chief who dismissed complaint of excessive force "despite evidence of [the officer's] use of excessive force contained in the report and … involvement in other police dog bite incidents"); *Est. of Shafer ex rel. Shafer v. City of Elgin, Or.*, No. 2:12-CV-00407-SU, 2014 WL 6633106, at *23 (D. Or. Nov. 21, 2014) ("Plaintiff's expert Mr. Yerger opined Officer Kilpatrick should have been disciplined after Chief Lynch or the City Council received citizen complaints about Officer Kilpatrick's use of

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

force. As such, a reasonable jury could also conclude the City's failure to discipline Officer Kilpatrick constituted a policy for purposes of *Monell*.").

### C.    The County fails to adequately guard against use of force against restrained individuals

The County is liable under *Monell* for Deputy Ramos's use of force against Mr. Burt for a third reason: Ramos's use of force was caused by the County's failure to train or instruct officers not to use force against handcuffed or restrained individuals. The Supreme Court has recognized that municipalities can be liable for failing to provide adequate training or guidance to officer where, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). In such situations, "the failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury." *Id.* Put another way, a failure to train can be shown where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). The question is whether "the need for more or different training for medical staff was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the County can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 388.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### 1. The County Fails to Provide Policies and Training Limiting Force Against Handcuffed and Restrained Subjects

The Sheriff's Office provides no specific policy for deputies related to the use of force on people who are handcuffed. (Exh. N, Lewis Depo. at 9:2-17.) And although the Department trains deputies on how to handcuff people and how to control people who are handcuffed, Exh. N, Lewis Depo. 15:19-16:14, 22:15-23:1, it notably does not specifically train deputies on how to escort people who were handcuffed or how to take care not to allow handcuffed people to fall, nor does the Department's training on controlling people who are handcuffed provide any specific cautions about using force on people who are handcuffed or restrained. (*Id.* 21:17-22:1, 23:19-24:13, 25:14-25.)

As Plaintiff's expert Roger Clark explains, these omissions reflect "serious deficiencies" in the Department's policies and practices. Clark notes, "Other agencies caution peace officers about the risks of using takedowns or other force against subjects who are handcuffed or otherwise restrained." Clark points to the San Diego Police Department's use of force policy, which states,

> Officers should use caution when using a takedown technique on a handcuffed prisoner. There is potential for injury since the prisoner's hands are behind his or her back, and they have no way of breaking his or her fall. If possible, when the person is handcuffed, officers should consider other controlling methods prior to a takedown.

(Clark Dec., ¶ 18 (quoting San Diego Police Department, Department Policy 1.04—*Use of Force*, § V.B).) The Los Angeles Sheriff's Department ("LASD") Use of Force policy provides:

> Physical force shall not be used against individuals in restraints, except as proportional, objectively reasonable, and that which reasonably appears necessary to prevent their escape, prevent the destruction of property, or prevent imminent bodily injury to the subject, the Department member, or another person. In these situations, only a proportional amount of force that is objectively reasonable and reasonably appears necessary to control the situation shall be used.

41

(Clark Dec. ¶ 19 (quoting LASD, Manual of Policy and Proc. 3-0/020.00 - *Use of Force Policy*).) LASD policy also provides "a presumption that further investigation is necessary if a subject sustains unexplained injuries or there is evidence that face, head, or neck strikes were used by Department members (whether by fists, knees, feet, or weapons) against a handcuffed subject." Clark Dec. ¶ 20.

The Santa Clara County Sheriff's Department Custody Manual contains the following provisions in a section of the use-of-force policy on "takedowns":

> Fall Risk: Deputies shall recognize the risk of injury to a person in a takedown, particularly when the person is handcuffed or shackled, which limits the person's ability to break their fall.

(Clark Dec. ¶ 21.) Clark also notes that numerous other agencies (including Riverside Sheriff's Department, San Bernardino Sheriff's Department, and Orange County Sheriff's Department) "list among the factors to consider in determining whether force is appropriate the degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained," as part of a standard policy used by more than 95% of police agencies in California. (Clark Dec. ¶ 22.)

**2. The County was on notice of the deficiencies in its policy by December 2022.**

By December 2022, the County was on notice that its use of force policy was failing to instruct deputies not to use force on restrained individuals. In addition to the lawsuits alleging excessive use of force against restrained individuals — Plaintiff has already pointed out nine specific lawsuits alleging that deputies used force unlawfully against restrained individuals, including the $80 million jury verdict in the death of Lucky Phounsy the same year that Ramos used force against Mr. Burt. *See supra*, Part II.A.3 (discussing *Bell*, *Fisher*, *Jimenez*, *Martinez*, *Myles*, *Steinmeier*, *Villa*, *Phounsy*, and *Strode*).

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Indeed, in August 2022, just four months before Ramos's use of force on Mr. Burt, a federal judge upheld the jury verdict against the County in the Phounsy case. The Court based its reasoning in part on the same theory advanced here — that, based on evidence presented at trial, the court concluded "**a reasonable jury could conclude that the County failed to train its officers on how to prevent the use of excessive force on an individual in maximum restraints**." *K.J.P. v. Cnty. of San Diego*, 621 F. Supp. 3d 1097, 1129–30 (S.D. Cal. 2022). After this ruling, mere months before Deputy Ramos's use of force on Mr. Burt, the County was certainly on notice that its policies regarding force on restrained individuals were lacking.

**D.     *Monell* does not require that the County's policies are facially unlawful.**

The County asserts that "[t]o establish *Monell* liability based on a written policy Plaintiff must show that the policy was, under the relevant timeframe, *facially* unlawful." County Mot. at 7:14-15. But that is simply not the law. To establish municipal liability under *Monell*, a plaintiff need only show that they suffered a constitutional rights violation, that the violation was committed pursuant to policy, and the policy was the moving force behind the violation. *Gordon*, 6 F.4th at 973. This has nothing to do with the standard for challenges to laws or policies as facially unconstitutional, and the County cites no case that suggests otherwise.

The County cites *Christie v. Iopa*, 176 F.3d 1231, 1241 (9th Cir. 1999), which in no way supports this theory. *Christie* rejected the plaintiff's argument that a county could be liable for an individual prosecutor's charging decisions that the office had a policy of delegating to deputy prosecutors. But *Christie* emphasized that the particular violation asserted was not a known or obvious consequence of the policy of delegating decisions to line prosecutors and that accepting an argument that a policy of conferring discretion on employees made a municipality liable for any decision made would amount to *respondeat superior* liability.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Here, Ramos's use of excessive force on Mr. Burt flowed directly from the County's policy of tolerating and failing to discipline for excessive force, including their failure to discipline Ramos for his strikingly similar unjustified take-down of a partially handcuffed man, Joshua Strode, in 2017: Ramos used excessive force on Strode. The County failed to discipline him, consistent with their policy of failing to investigate and correct excessive force, and Ramos predictably used the same type of excess force again. Ramos's violence against Mr. Burt flowed from the County's custom and practice of failing to discipline. *Christie* is inapposite.

## III.    Plaintiff's Bane Act claim rests on *respondeat superior* liability for Ramos's conduct

The County wrongly suggests that Plaintiff's claim under Civil Code § 52.1, the Bane Act, "fails because … Plaintiff cannot demonstrate the County violated the Constitution." County Mot. at 25:6-8. But under Cal. Govt. Code § 815.2, "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment" to the extent employees are liable. "As such, federal courts have held that public entities can be sued for vicarious liability under California civil rights statutes." *Astorga v. Cnty. of San Diego*, No. 321CV00463BENKSC, 2022 WL 1556164, at *3 (S.D. Cal. May 17, 2022) (citing *Gant v. Cnty. of Los Angeles*, 772 F.3d 608, 623 (9th Cir. 2014)). Because Defendant Ramos is not entitled to summary judgment on Plaintiffs' Bane Act claim against him, *supra* Part I.E, the County is not entitled to summary judgment either.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Jamel Burt respectfully submits that this Court should deny Defendants' motions for summary judgment.

Respectfully submitted,

Dated: July 13, 2026

**IREDALE AND YOO, APC**
**JOSEPH C. CRUDO PLC**

*s/ Peter Bibring*
PETER BIBRING

*s/ Sarah Musumeci*
SARAH MUSUMECI
Attorneys for Plaintiff

45