DAMON M. BROWN, County Counsel (SBN 242265)
By: TIMOTHY A. HANNA, Senior Deputy (SBN 310620)
    CHRISTOPHER M. BLAYLOCK, Supervising Deputy (SBN 284629)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone:  (619) 904-0151; (619) 531-2469; (619) 531-6005
E-mail: timothy.hanna@sdcounty.ca.gov; christopher.blaylock@sdcounty.ca.gov

Attorneys for Defendant County of San Diego and
Nicolai Ramos

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMEL BURT,<br><br>    Plaintiff,<br><br>  v.<br><br>NICOLAI RAMOS, in his individual capacity, COUNTY OF SAN DIEGO; and DOES 1-5,<br><br>    Defendants. | No. 24-cv-00662-CAB-VET<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANT NICOLAI RAMOS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: July 27, 2026<br>District Judge: Hon. Cathy A. Bencivengo<br>Courtroom: 15A<br><br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

# I.    INTRODUCTION

Plaintiff has failed to demonstrate that he can meet his burden of proof on his excessive force, retaliation and contingent state law claims against Deputy Ramos. Specifically, he has failed to demonstrate that Deputy Ramos' use of force was not reasonable under the totality of the circumstances for his excessive force claim, nor has he demonstrated that Deputy Ramos was acting with retaliatory animus for his retaliation claim. Further, Plaintiff has failed to rebut Deputy Ramos' entitlement to qualified immunity considering the legal standard they seek to apply for excessive force is far to broad and whether his speech is constitutionally protected is far too unsettled for either to be conclusively established under these circumstances. Summary Judgment dismissing these claims against Deputy Ramos must be granted in light of Plaintiff's inability to overcome this defense or establish key elements of his causes of action.

# II.    ARGUMENT

## A. Deputy Ramos's interpretation of Plaintiff's flexing was reasonable under the totality of the circumstances such that the force used was a reasonable proportional response to Plaintiffs combative tone, language and posture.

Plaintiff paints a distorted picture that he was a compliant ragdoll throughout the police interaction. To achieve this illusion, Plaintiff ignores the fact that he destroyed evidence, lied about it, refused to answer basic identification questions, and hurled profanities at Deputy Ramos. Consistent with his hostile cues before the takedown, after the takedown Plaintiff threatened to kick and spit on Deputy Ramos. In his last interaction with deputies a mere month before Deputy Ramos, Plaintiff clearly tries to intimidate and pull against officers who are trying to detain him demonstrating his modus operandi when confronted by law enforcement.[1]

---

[1] Plaintiff's opposition asserts that his behavior after the incident and in other similar situations is not relevant because Deputy Ramos was not aware of such behavior at the time of the take down. But that is not why it is proffered. Instead Plaintiff's post-incident threats, and habit or custom in other similar interactions with deputies, is circumstantial

-1-

Deputy Ramos on the other hand, who had probable cause to arrest Plaintiff for possession of paraphernalia and destroying evidence before he ever began interacting with Plaintiff, had every right to ask Plaintiff identifying questions and escort Plaintiff to the patrol vehicle. Even under the most generous and favorable interpretation of the evidence, Plaintiff was flexing his muscles to hold up his pants during that escort. Plaintiff's opposition concedes this and simply argues, with his hired expert's post-hoc analysis, that Deputy Ramos should have understood the flexing was caused by Plaintiff's drooping pants, and he should have stopped to politely help the decidedly impolite Plaintiff with those pants. Yet nothing in the evidence indicates Deputy Ramos knew Plaintiff's pants were falling down. Plaintiff certainly did not tell Deputy Ramos that his pants were falling when Deputy Ramos repeatedly said "Stop flexing." Instead Plaintiff responded with "Fuck you bitch, Shut up, Shut up, Shut up, Bitch ass motherfucker, Shut up." When viewed in totality, that is Plaintiff's flexing combined with his language, tone and posture, it was objectively reasonable for Deputy Ramos to perceive an imminent threat.

Plaintiffs cited cases are not sufficiently analogous to defeat qualified immunity, as discussed in further detail below. Nevertheless, if Plaintiff's cited law is instructive of anything, it is that the force used must be proportional to the conduct of the plaintiff. Using weapons and K9s on generally compliant detainees is not proportional. Even multiple officers piling on a single polite plaintiff who had not even given officers reasonable suspicion to detain, let alone arrest, is not proportional. However, even a pain compliance wristlock used to wrench a trespasser to his feet, after the trespasser ignored multiple warnings to move, can be reasonable under the circumstances. *Zorn v. Linton* 146 S.Ct. 926 (2026). Here Deputy Ramos's take down was proportional to the combative cues presented by the Plaintiff who had destroyed evidence, lied about it, refused to answer

///

---

evidence of how he behaved and responded to Deputy Ramos in this instance, before the take down, and to contradict Plaintiff's self-serving assertion that he did not resist or threaten in any way because he "knows how to handle himself" in such situations.

No. 24-cv-00662-CAB-VET

basic identifying questions and then continued to hurl profanities while flexing during a lawful escort.

Even if the Court in hindsight finds Deputy Ramos misread the cues, the Court should find that Deputy Ramos's interpretation of those hostile cues, in the heat of the moment, was a reasonable interpretation. Taken together and viewed, as the law requires, under the totality of the circumstances, it was therefore reasonable for Deputy Ramos to interpret Plaintiff's flexing as a precursor to a fight or escape, and thus it was reasonable to take Plaintiff to the ground to prevent such an outcome.

### B. Plaintiff's proffered legal standard uses the incorrect "high level of generality" standard and thus he has not met his burden of citing clearly established law to defeat qualified immunity.

Plaintiff seeks to broaden and generalize the standard for what qualifies as prior precedent for the purposes of Qualified Immunity. Then hoping this Court applies a more broadened standard, Plaintiff offers precedent largely involving much greater uses of force, mostly with weapons, against what Plaintiff generally characterizes as non-resistive subjects.  Such cases do not meet the standard set forth by the Supreme Court.  All of Plaintiff's cases involve far greater force than used here, including bean bag guns to the face, tasers, pepper spray, K9 attacks and six on one dogpiles.  Morevover, the conduct faced by the deputies and officers in those cases ranged from polite requests to speak to a supervisor to mentally disturbed ranting and attempts to evade apprehension; different than the goal-oriented, hostile and intimidating language and posture posed by Plaintiff.

Plaintiff's attempt to broaden the standard of what qualifies as Qualified Immunity defeating precedent is the exact opposite direction that Supreme Court guidance has gone in recent years.  For example, in *Kisela v. Hughes* the High Court overturned the Ninth Circuit's denial of Qualified Immunity after the Ninth Circuit applied too broad a standard. In that case the High Court specifically admonished that "This Court has " 'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.' " *City and County of San Francisco v. Sheehan,* 575 U.S. 600, 613,

-3-

No. 24-cv-00662-CAB-VET

135 S.Ct. 1765, 1775–1776, [remaining citations omitted]." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). The High Court also addressed another case relied upon by the Ninth Circuit there, which Plaintiff here also relies, *Deorle v. Rutherford* 272 F.3d 1272 (9th Cir. 2001); The Court cautioned that: "As for *Deorle,* this Court has already instructed the Court of Appeals not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law. *Sheehan,* 572 U.S., at 575, 614-616." *Kisela,* 584 U.S. at 106.

As recently as in 2026, the Supreme Court has re-emphasized that it requires a "high degree of specificity" in the factual analogy such that the proffered prior case or cases "obviously resolve" the issue. *Zorn* 146 S.Ct. at 926. In *Zorn*, an arrestee brought a § 1983 action asserting an excessive force claim against a police sergeant who used a routine wristlock, after repeated warnings, to overcome her passive resistance and bring her to her feet during her arrest for trespass. *Ibid*. The Second Circuit had reversed the District Court's grant of summary judgment on qualified immunity grounds by finding that it was clearly established by *Amnesty America v. West Hartford,* 361 F.3d 113 (2004) that the "gratuitous" use of a rear wristlock on a protestor passively resisting was excessive force. *Ibid*. The Court held that even if *Amnesty America* established the general principle "that the gratuitous use of pain compliance techniques-such as a rear-wristlock-on a protestor who is passively resisting arrest" it "lacks the 'high degree of specificity' needed to make it 'clear' to officers which actions violate the law." *Id*. at 931. The High Court concluded that Circuit court erred in defeating Qualified Immunity "[b]ecause the Second Circuit failed to identify a case where an officer taking similar actions in similar circumstances 'was held to have violated' the Constitution". *Ibid.*, quoting *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 43 (2019).

Plaintiff's argument here at its core mirrors the argument rejected by the Supreme Court in *Zorn*. Namely that the force used against an allegedly compliant arrestee was "gratuitous." The Supreme Court demanded: show us a case where that specific level of

///

-4-

force was used in the circumstances faced by that specific officer.  The plaintiff and Circuit court failed in *Zorn,* as Plaintiff fails here.

### C. Applying the correct, "high degree of specificity" standard, Plaintiff's proffered cases fall well short of defeating Qualified Immunity.

All force is not created equal. The use of weapons, by any standard, is a higher level of force than a manual take-down without use of any weapons. Yet, all but one of the cases cited by Plaintiff involve officers using weapons. Specifically, a bean bag gun to the face (*Deorle*), a taser (*Bryan*), pepper spray (*Smith, Headwaters,* and *Young*), and even a police K9 (*Smith*).

The only case Plaintiff cites that does not involve officers using weapons against a detainee is *Rice v. Morehouse*. The defense has already addressed *Rice* in its initial briefing on its Motion for Summary Judgment. However, given that Plaintiff relies so heavily, indeed primarily, on *Rice*, it bears revisiting.

First the level of force: Again *Rice* did not just involve a take down.  It involved a take down by *multiple* officers who then "repeatedly struck and kneed" the plaintiff, "wrenched his arms and shoulders, and twisted his fingers." *Rice v. Morehouse*, 989 F.3d 1112, 1117 (9th Cir. 2021). Not only does this represent a greater use of force than Deputy Ramos employed – several officers overpowering a single detainee necessarily entails a quantum of force greater than a single officer can exert – but the ratio directly implicates the need for force. Multiple officers with hands on the detainee necessarily weighs against the *need* for force in the first instance because multiple officers should in theory be able to more easily control a detainee should that detainee try to fight. Officer Ramos on the other hand was alone and out-sized, putting him in a far more precarious position than the officers in *Rice*.

Second, Plaintiff's attempt to put the underlying offenses on equal ground, in order to categorize Plaintiff's crimes as "not particularly severe," (Plaintiff's Opposition to Defendants' Motions for Summary Judgment ("Plaintiff's Opposition") [ECF No. 94] at p. 13), fails.  The criminal posture of the two cases do not equate.  In *Rice* a state court

concluded that the officers "lacked reasonable suspicion or probable cause to stop" Rice. In other words, the officers had no legal cause to go hands on in the first instance. In contrast, here, by the time Deputy Ramos began talking to Plaintiff, the deputy had already seen Plaintiff throw an object out the window and verified that it was a meth pipe, giving Deputy probable cause to arrest. Thus in that respect the Fourth Amendment analysis of this case more closely mirrors *Zorn* than *Rice.*

Third, as Plaintiff's conduct, the key distinction in *Rice* is that there was no allegation of resistance at all; indeed, the plaintiff in *Rice* was unquestionably verbally polite and non-combative. *Narciso v. Cnty. of San Diego*, No. 20CV116-LL-MSB, 2022 WL 3447509, at *7 (S.D. Cal. Aug. 17, 2022) (characterizing the plaintiff in *Rice* as "perfectly passive, engaged in no resistance, and [who] did nothing that could be deemed particularly bellicose." In contrast, Plaintiff here is the textbook example of "bellicose."[2]

Plaintiff nevertheless asserts that mere "crude and insulting language" cannot constitute a threat. (Plaintiff's Opposition [ECF No. 94] at p. 12) As a practical matter, Plaintiff's argument ignores basic human psychology. No fight starts with the combatants exchanging pleasantries. All fights start with aggressive verbal sparring. That is why they call them "fighting words." Here Plaintiff's words were fighting words, signaling to any reasonable person with any sense of self-preservation that Plaintiff's intentions were hostile and that violence was near. In such circumstances deputies need not wait until they are headbutted, kicked, or spit on or otherwise actually assaulted to react. Words can infer an attack is imminent, justifying pre-emptive force. See e.g. *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906 (9th Cir. 2024), (suspect's ambiguous and PG-Rated verbal statements — "I know" and "you have to" in response to warnings of deadly force — were directed at officers and reasonably interpreted as signaling an intent to harm such that officers were justified in responding with lethal force before any actual attack.)

///

---

[2] "[I]nclined or eager to fight; aggressively hostile; belligerent; pugnacious https://www.dictionary.com/browse/bellicose

Practical considerations aside, Plaintiff's cited cases, for the alleged proposition that words are not enough, fail to inform a scenario where a plaintiff's fighting words are aggressively hurled at the officer in close proximity.  Specifically, in *Bryan,* there was no evidence of the plaintiff directing any aggression toward the officer and instead the court expressly stated that the plaintiff "yelled expletives *to himself.*" *Bryan v. MacPherson*, 630 F.3d 805, 822 (9th Cir. 2010). That court ultimately found that shooting the plaintiff with a taser while the plaintiff stood "approximately twenty feet away" having a "stationary, bizarre tantrum" was unreasonable under the circumstances. *Id.* at 832.  Here Plaintiff was not having a mere "bizarre tantrum." Plaintiff's expletives were goal-oriented and directed *at* Deputy Ramos.  More importantly, they were directed at Deputy Ramos in close physical proximity, within a range where even Plaintiff concedes he could "kick, headbutt, spit, bite or run." (Plaintiff's Opposition [ECF No. 94] at p. 13).  Thus *Bryan* is in no way instructive or analogous to the close proximity aggression that Plaintiff directed toward Deputy Ramos.

As an adjunct to *Bryan*, Plaintiff also asks the court to "See also *Smith*, 394 F.3d at 702-03" for the proposition that "shouting expletives" does not equate to posing a threat to officers.  That is hardly the holding of *Smith*: Shouting expletives was an ancillary factor and not the central issue.  *Smith* is a case of disproportional force: The ultimate force used, and the force evaluated for *Graham* balancing, was wildly more severe than the force at issue here.  In *Smith,* multiple officers "slammed Smith against the wall, threw him to the ground, slid him off the porch while face down, pepper-sprayed him repeatedly, and either permitted or instructed [a police K9] to attack him on three occasions. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)

In short, none of the cases cited by Plaintiff defeat Qualified Immunity because they all "lack[] the 'high degree of specificity' needed to make it 'clear' to officers which actions violate the law." *Id*. at 931.  To find Plaintiff's cases instructive to the present facts requires violating our Supreme Court's mandate to lower courts, admonishing them "not to define clearly established law at a high level of generality.' " *Sheehan,* 575 U.S. at p. 613. Use of

weapons or even multiple officers dogpiling on a plaintiff who politely asked to see a supervisor while being detained without reasonable suspicion or probable cause is not the same as the situation faced by Deputy Ramos. Here, Deputy Ramos had probable cause to arrest the larger, deceptive, combative, Plaintiff who gave every indication that his flexing was intended to intimidate and convey imminent violence when he flexed his muscles while challenging the Deputy with "Fuck you bitch, Shut up, Shut up, Shut up, Bitch ass motherfucker, Shut up." Given the lack of clearly established law under *those* circumstances, Deputy Ramos is entitled to Qualified Immunity.

### D. Plaintiff has failed to demonstrate his speech was "constitutionally protected" for purposes of a retaliation claim

Plaintiff's opposition improperly relies on protections for obscenities in other contexts to imply such speech is entitled to protection in this instance. However, Plaintiff's argument would require a dramatic expansion of the law that would hinder law enforcement officers' ability to perform one of their most basic duties during any traffic stop or investigatory detention- confirming the individual's identity. *United States v. Hensley,* 469 U.S. 221, 229 (1985) ("[T]he ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice") Deputy Ramos is entitled to qualified immunity because it is not "clearly established" that vulgarity and protesting to police conduct when intertwined with a refusal to answer questions during a lawful investigatory detention is protected speech.

There is no Ninth Circuit authority directly applying the First Amendment to an individual's refusal to answer questions regarding one's identity during a lawful investigatory detention. Plaintiff's reliance on *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372 (9th Cir. 1990) is misplaced as it does not stand for the proposition that it is conclusively established that any obscene gestures or language to an officer is entitled to constitutional protection. In *Duran*, the Court analyzed a retaliatory stop and arrest based solely on a citizen's verbal criticism of an officer. *Id.* at 1377 ("Missing from the record

-8-

here is any legitimate, articulate reason for [the Officer] to have detained [Plaintiff]…. Defendant relies heavily on the fact that [Plaintiff] was making obscene gestures toward him and yelling profanities in Spanish while traveling along a rural Arizona highway.") Put differently, the clearly established law from Duran addresses using official authority to stop or arrest someone for protected speech, not the application of force during an escort necessitated by Plaintiff's failure to confirm his identity. *Id.* at 1378.

It is far from clearly established that Plaintiff may ignore Deputies' requests for his identifying information. As noted in the underlying motion, the vulgarity and obscene comments Plaintiff claims are protected were used by Plaintiff in his refusal to confirm his identifying information. Taken to its practical limitations, Officers would be severely hindered in their ability to determine a suspect's identity if such speech were protected because almost any action a police officer takes against an individual- whether its arrest, detention, etc.- can be considered adverse for the purposes of a retaliation claim. Put differently, an officer should not be limited in their ability to ascertain an individual's identity depending on something so arbitrary as whether or not they used profanity. Clearly, it would be an unfair administration of justice if whether an arrest for refusing to identify oneself was retaliatory hinged on whether they used profanity in their refusal. Retaliation claims purposefully extend only to protected speech and should not be expanded to speech which is not "clearly established" as protected under the Constitution.

### E. Plaintiff cannot establish that "protected" speech was a substantial motivating factor

Plaintiff contends that the proximity in time between Mr. Burt's protected speech and the use of force is admissible circumstantial evidence of his retaliatory motivation. Retaliation requires Plaintiff to prove "that (1) the officer's conduct 'would chill or silence a person of ordinary firmness from future First Amendment activities,' and (2) the officer's desire to chill speech was a 'but-for cause' of the adverse action." *Sharp v. County of Orange*, 871 F.3d 901, 919 (9th Cir. 2017), citation omitted. To prevail on a First Amendment retaliation claim, Burt must show that protected activity was a 'substantial or

motivating factor' in Ramos's conduct—not merely that force followed speech in close temporal proximity.

In *Lesher v. City of Anderson*, 763 F. Supp. 3d 1115 (E.D. Cal. 2025), the trial Court granted summary judgment on Plaintiff's retaliation claim fails because she "[could not] show that retaliatory animus was a substantial factor behind h[er] arrest." *Id.* at 1118. The Court noted that "[t]o permit the finding of a First Amendment violation from the bare fact that plaintiff was arrested after expressing verbal disagreement would open the door to allowing a First Amendment retaliation claim under § 1983 for every arrest in which there is a verbal conflict between officer and arrestee." *Id.* at 1118-1119.

Deputy Ramos's justification for the takedown was his perception that Plaintiff was physically resisting the escort causing him to lose his grasp and it was necessary to use force to regain control, not that Plaintiff was swearing at him. The temporal proximity argument collapses because the entire escort sequence—from the moment Deputy Ramos began walking Plaintiff to the patrol vehicle—was continuous, and the force was applied in response to what Ramos perceived as a physical movement, not in direct response to a verbal statement. Like *Leshner*, the bare fact that Plaintiff was arrested after expressing verbal disagreement with Deputies Ramos and Wilder should be insufficient to establish retaliatory animus where an officer has an objectively reasonable, non-retaliatory justification for force. Under such circumstances, the mere fact that protected speech preceded the force does not establish that the speech was a substantial motivating factor.

## III.  CONCLUSION

For all of the reasons discussed above, Defendant Ramos respectfully requests this Court grant summary judgement on Plaintiff's claims for excessive force, retaliation, assault and battery and violation of the Bane Act.

DATED: July 20, 2026          DAMON M. BROWN, County Counsel

By:___*/s/ Timothy A. Hanna*_____
TIMOTHY A. HANNA, Senior Deputy
CHRISTOPHER M. BLAYLOCK, Senior Deputy
Attorneys for Defendant County of San Diego, and
Nicolai Ramos

-10-