DAMON M. BROWN, County Counsel (SBN 242265)
By: TIMOTHY A. HANNA, Senior Deputy (SBN 310620)
CHRISTOPHER M. BLAYLOCK, Supervising Deputy (SBN 284629)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 904-0151; (619) 531-2469; (619) 531-6005
E-mail: timothy.hanna@sdcounty.ca.gov; christopher.blaylock@sdcounty.ca.gov

Attorneys for Defendant County of San Diego and Nicolai Ramos

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

JAMEL BURT,

Plaintiff,

v.

NICOLAI RAMOS, in his individual capacity, COUNTY OF SAN DIEGO; MICHAEL ALCARION, in his individual capacity; and DOES 1-5,

Defendants.

No. 24-cv-00662-CAB-VET

**DECLARATION OF TIMOTHY A. HANNA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 3 TO EXCLUDE EVIDENCE OF PLAINTIFF'S STATEMENTS AND CONDUCT IMMEDIATELY AFTER USE OF FORCE**

Hearing: October 16, 2026
Time: 2:00 P.M.
Courtroom: 15A
Judge: Hon. Cathy A. Bencivengo

I, TIMOTHY A. HANNA, declare:

1. I am a Senior Deputy with the Office of County Counsel for the County of San Diego and counsel of record for Defendants County of San Diego and Nicolai Ramos. I am familiar with the facts of this case and, if called upon, could and would testify to the facts set forth below based on my personal knowledge.

2. Attached hereto as **EXHIBIT A** is a true and correct copy of excerpts from Plaintiff Jamel Burt's Deposition Testimony, taken on October 8, 2025.

3. Attached hereto as **EXHIBIT B** is a true and correct copy of excerpts from Defendant Nicolai Ramos' Deposition Testimony, taken on June 12, 2025.

I declare under penalty of perjury under the laws of these United States that the foregoing is true and correct. Executed this 5th of October 2026, at San Diego, California.

TIMOTHY A. HANNA

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAMEL BURT, ) No. 24-CV-00662-CAB-VET

Plaintiff,

v.

NICOLAI RAMOS, in his individual capacity, COUNTY OF SAN DIEGO; MICHAEL ALCARION, in his individual capacity; and DOES 1-5,

Defendants.

VIDEO DEPOSITION OF JAMEL BURT

VOLUME 1, PAGES 1 THROUGH 128

WEDNESDAY, OCTOBER 8, 2025

SAN DIEGO, CALIFORNIA

Reported by:
Kathleen Madden Keenaghan
CSR No. 14577
Job No. 10173500

**can ask more about that, but if you look down at the bottom of the first paragraph, it says, during the course of my investigation, Burt became aggressive and uncooperative. Let me ask you this, do you believe -- would you agree that your behavior in this instant was aggressive?**

A No.

**Q And how would you characterize your behavior?**

A When we first stopped, up until when Ramos got involved with the incident, everything was fine. I was being asked questions. I was giving Officer Wilder the answers, and everything was fine.

**Q Okay. And what was it about -- about Deputy Ramos that changed that?**

A He was being competitive. He was -- I don't know -- like, badgering -- badgering us. He was trying to intimidate us, basically.

**Q And how did that make you feel?**

A I don't like being intimidated.

**Q And so how did you respond?**

A I told him to stop talking to me. Shut the fuck up and stop talking to me.

**Q And what did you expect would occur when you said that?**

A Him to leave me alone. I didn't have -- I wasn't driving. I didn't have any drugs. I was cooperating, yeah.

That was it.
Q **And you mentioned -- you mentioned you were cooperating. He characterized your behavior as uncooperative. Would you disagree with that statement?**
A Absolutely.
Q **At a certain point you refused to answer questions; is that right?**
A I gave them enough to run my name and to find out my information. So there was nothing else that we needed to talk about it.
Q **Okay. And what did you expect would be -- what was the expected outcome of that refusal?**
A I expected him to do his job.
Q **And what do you mean by that?**
A I gave you my name and my birthday. Run it through your system and find out what you need to know.
Q **And then we will go through this a little further, but it also says that if you move down to one of these paragraphs, the third paragraph down, it says due to having uncooperative behavior, paramedics declined to transport to the hospital. Do you remember paramedics arriving at the scene?**
A Absolutely, I asked for them.
Q **Do you recall being seen by paramedics?**
A I recall talking to paramedics.

think that?
A No.
Q Okay. And when you say -- let me ask you did it make you angry?
A Did?
Q Did the officer's attitude towards you make you angry?
A Yes. I was upset.
Q And next, the officer claims he was putting you up against the vehicle and claims you quickly turned to the right causing him to lose his grasp. Would you agree with that?
A No. Absolutely not.
Q Okay. Do you recall turning to the right at all?
A Absolutely not.
Q Do you recall looking over your shoulder to try to address them?
A Absolutely not. I have been escorted to the police car before, and I was -- I was adapting to him. He was the one in control moving me this way and that way. So I just went to where he guided me.
Q Do you recall him losing his grasp at any point?
A Absolutely not.
Q Okay. And then after, he threw you on the ground; is that right?

way down?
A Yes, sir.
Q I understand. And it looks like there were several -- were you wearing boxers and shorts?
A I was wearing boxers and shorts and another pair of shorts over those.
Q Okay. And sir, you just chuckled a bit. I wanted to ask you, what struck you about that?
A Because although he put his finger there, you could not tell that there was any room. You just put his finger over there and said I put my finger over here, but they were tight.
Q Okay.
A I'm not -- look, I have been in custody a few times. I'm not going to cry that the handcuffs are tight if they are not. Do you know what I mean?
Q I understand. All right. And so at that point, you said -- sorry. We are at about 9:20 here, and you had mentioned I want to kick you in the face.
A Yes, sir.
Q What do you mean by that?
A Exactly what it sounds like. I wanted him to feel the same thing I felt.
Q And were you angry?
A Absolutely.

Q **Frustrated?**
A Absolutely.
Q **Embarrassed?**
A Absolutely.
Q **What other emotions are you feeling?**
A Shock. I felt shock, and I felt in danger.
Q **So let me ask you about shock. When you say shock, do you mean that it was unexpected?**
A Absolutely. I have not done anything to warrant that.
Q **And when you say danger, what danger did you fear?**
A This man just slammed me on my face for no reason. I did not want to be in his company. There is no telling what he could have done to me. I am handcuffed and this man has every advantage. And he has already demonstrated that he has no care for my life and safety. I felt I was in danger.
Q **Yeah. And did he use force against you?**
A He rubbed my face in the ground. That was it.
Q **And when you say rubbed your face in the ground, was that on the concrete?**
A I'm not sure.
Q **What part of your face was rubbed in the ground?**
A My whole side. It's on the video.
Q **Oh, yeah. And so just kind of pausing here. We're**

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMEL BURT,

Plaintiff,

vs.

CASE NO. 24-CV-0662-CAB-VET

NICOLAI RAMOS, in his individual capacity; COUNTY OF SAN DIEGO; MICHAEL ALCARION, in his individual capacity; and DOES 1-5,

Defendants.

---

DEPOSITION OF NICOLAI RAMOS

SAN DIEGO, CALIFORNIA

THURSDAY, JUNE 12, 2025

REPORTED BY:
SHARRON K. NISBETT, CSR, RPR
CSR NO. 9839

flexing?

A. No, sir, I did not.

Q. And then at some point he turned his body and you decided at that point to throw him to the ground, correct?

A. Again, leading up to this, sir, the totality of the call was -- the prolonged time it took for the traffic stop, me conducting an investigation, the fact that Mr. Burt was uncooperative in providing information to where he was flexing on my way to the car, then at that point that you're speaking about where he pulled away from me, was when I decided to -- yes.

Q. I'm going to move to strike all of that as nonresponsive.

This is my question, sir. After he turned his body, you then decided to pull him to the ground? Yes?

A. May I look at my report, sir?

Q. Yes. Why don't you look at page 9?

A. So going to that -- I wrote, I attempted to de-escalate the situation by telling Burt to stop flexing but he continued yelling, "Shut up, bitch-ass mother-fucker." I attempted to maintain positive control of Burt by pushing his body up against Deputy Wilder's patrol vehicle. As I attempted to do, so I felt Burt quickly turn his body to his right, which

caused me to temporarily lose the grasp I had over his left arm with my right hand. Thinking Burt was attempting to escape, I made the decision to take Burt down to the ground.

Q. All right. And you thought he was trying to escape, right, with his hands cuffed behind him and you've seen the body-worn camera now, with his hands cuffed behind him and his pants down around his knees, you thought he was going to escape and you had to take him and grind his face into the ground, right?

MR. HANNA: Objection. Argumentative.

BY MR. IREDALE:

Q. Is that right?

A. And, sir, as I stated in jail I've had people that are in handcuffs and leg chains --

Q. No, that's not responsive to my question, sir.

My question is: You told me you thought Mr. Burt was going escape. Are you telling me the truth, you really thought he was going to escape with his hands cuffed behind him? Is that really the truth, that you needed to bring him down to prevent him from escaping? Is that your testimony?

A. Sir, yes --

Q. That's my question. Is that the truth? Yes or no?